(No. 12496.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD SINGER, Plaintiff in Error.

*Opinion filed April 15, 1919—Rehearing denied June 4, 1919.*

1. CRIMINAL LAW—*question of granting a continuance because counsel is engaged in another case rests in discretion of the court.* The question of granting a continuance because counsel is engaged in another case is largely in the sound judicial discretion of the trial court, and its action will only be disturbed on appeal when it is shown that such discretion has been abused.

2. SAME—*when trial should not be indefinitely postponed.* No person accused of crime ought to be forced to the trial of his case without a reasonable opportunity to employ counsel and properly prepare for trial, but the mere fact that counsel of record for the defendant is engaged in the trial of another case which it appears will last for a considerable time is not necessarily ground for an indefinite continuance.

3. SAME—*when improper evidence volunteered on cross-examination is not reversible error.* The fact that a witness volunteers improper evidence while being sharply cross-examined is not reversible error, where the improper statement is promptly stricken by the court on motion of counsel conducting the examination.

4. SAME—*when defendant may be convicted under Confidence Game statute.* If the transaction for which a defendant is prosecuted is such as to show that he is guilty under the Confidence Game statute there is no error in trying and convicting him under such statute, although he is also guilty, by reason of the same actions, of a misdemeanor under other sections of the Criminal Code.

5. SAME—*act of 1917, relating to false checks, did not repeal Confidence Game act.* The act of 1917, (Laws of 1917, p. 344,) relating to drawing checks or drafts with intent to defraud, did not repeal the Confidence Game act, and a person may be convicted of the confidence game even though worthless checks or drafts are used in the transaction.

6. SAME—*what constitutes the confidence game—valid contracts may be used.* Any scheme whereby a swindler wins the confidence of his victim and swindles him out of his money by taking advantage of such confidence is a confidence game, and the use of valid contracts in a swindling scheme does not prevent said scheme from being a confidence game.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN J. SULLIVAN, Judge, presiding.

288 – 8

CAVENDER & KAISER, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and MARVIN E. BARNHART, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Edward Singer, was found guilty by a jury in the criminal court of Cook county of unlawfully obtaining from the West Side National Bank a large amount of money by means of the confidence game and was sentenced on this verdict to an indeterminate term in the penitentiary. This writ of error has been sued out of this court to review the judgment of the criminal court.

The evidence in the record shows that plaintiff in error in 1917 was the president and principal owner of a small private bank in Chicago known as the Wentworth Avenue Savings Bank and was also at the same time engaged in the real estate business; that on July 14, 1917, he opened an account with the West Side National Bank, located in Chicago in the same general locality as his business; that on July 17 he deposited to his account in the West Side National Bank three checks, for $200, $500 and $600, respectively, signed by M. Klein, payable to Singer, and drawn on the Wentworth Avenue Savings Bank and marked as certified by the last named bank by Nat Naso, assistant cashier; that on July 20 Singer presented to the West Side National Bank a check payable to the order of cash for $600, signed by himself, and requested the bank to pay him the money thereon; that the paying teller refused to cash this check, because, as he stated to Singer, the three certified checks which Singer had deposited to his account had not been paid; that Singer then went to Elenbogen, vice-president of the West Side National Bank, whom he per-

sonally knew and through whom he had opened his account in said bank. The evidence tends to show that Elenbogen and Singer had theretofore been acquainted for some time as members of the same lodge. It appears that some discussion ensued between Elenbogen and Singer, the latter stating that he had just come from the Wentworth Avenue Savings Bank and that the three certified checks had been paid. One of the officials of the West Side National Bank called up on the 'phone the Wentworth Avenue Savings Bank and was told by Naso, the assistant cashier, that these three certified checks were all right. Elenbogen then O. K.'d the $600 check and the money was paid to Singer.

Nat Naso testified on behalf of the State. He had been included with Singer in the indictment upon which Singer was tried and convicted. The evidence tends to show that he was not present at the opening of the trial but had forfeited his bail. It is argued by counsel for plaintiff in error here that he had turned State's evidence because of a promise of immunity on the part of the State's attorney's office. Naso denied that he had been promised immunity and there is no evidence in the record other than his own testimony on the question. He testified that he was twenty-eight years old and married; that from May, 1916, until July 25, 1917, when the authorities closed the Wentworth Avenue Savings Bank, he had worked for Singer at said bank, being called assistant cashier; that he did everything about the bank, from janitor to book-keeper; that before the bank opened at nine in the morning he went out with a wagon and peddled fruit; that he knew of no person by the name of Klein; that no such man had ever been in the bank to his knowledge or made any deposit there; that Singer had told him to start a "dummy" account in the name of Klein, which he did, but that no money had ever been deposited in Klein's account; that at Singer's direction he made the entries in the books which were offered in evidence; that Singer signed the name "M. Klein" to a

large number of checks, and that the money to pay these checks always came from the general funds of the bank or from money that Singer would bring in cash for the purpose of paying these checks when they came in; that at the close of business July 17 the total amount of money in the bank was $331.53, on July 18 it was $405.73 and on July 20, $258.67. He also testified that Singer had looked over the statement as to the amount of business done on these days and the balance on hand and O. K.'d the same. Singer testified denying that he had anything to do with making out the statements showing the amount of money on hand on those days, although he admitted that he had O. K.'d some of the statements, and he testified, as shown by the record, that on July 20 the balance in the bank was $503.67. Naso further testified that in making up the Klein account he frequently did not make the entries when the transaction occurred but figured them up on Sundays at Singer's direction, so that the books would show all right as to that account if the State's attorney's office ever began to investigate the bank's business. Singer told the officials of the West Side National Bank, when discussing the question of these three certified checks, that Klein was a wealthy customer of his who loaned money through his bank and for which Singer received commissions. Singer admitted at the time of the trial that Klein was a fictitious person but claimed that he had used that name and opened that account because he loaned money out on weekly payments and if he loaned it in his own name he could not charge commission; that he was also accommodating one of his friends by checks signed "M. Klein" and did not want it to appear that his checks were used for accommodation paper. The evidence also tends to show that at the time of the discussion between Singer and the officials of the West Side National Bank with reference to the payment of the three certified checks in question, and shortly thereafter, vice-president Elenbogen went to the Went-

worth Avenue Savings Bank and saw Naso; that this was
after banking hours and Naso told him that he could not
pay those checks until he saw Singer. Naso testified that
on that same day Singer had given him a check for $745
and $55 in currency to apply on the payment of these cer-
tified checks; that the next morning after he had told vice-
president Elenbogen that he did not want to do anything
about those checks until he had seen Singer, Singer took
back from him the check for $745. Naso further testified
that he had never seen the three certified checks in ques-
tion after he gave them to Singer to be deposited in the
West Side National Bank. These three certified checks
were sent by the West Side National Bank to the Federal
reserve bank for collection. Assistant cashier Carr of this
last named bank testified that three checks for the amounts
in question were received from the West Side National
Bank drawn upon the Wentworth Avenue Savings Bank;
that in the due course of the business of the Federal re-
serve bank they would be sent by mail for collection to
the Wentworth Avenue Savings Bank; that the employees
of that bank who then had charge of mailing out such
checks were at the time of the trial absent in government
service in France; that witness did not know positively
that these checks had been mailed out and did not know
that the men who had charge of that work would be able
to swear positively, if they were here, that such checks
had been mailed to the Wentworth Avenue Savings Bank.
Carr further testified that these three certified checks had
never been paid to the Federal reserve bank but had been
charged back to the account of the West Side National
Bank. The evidence tends to show that there was a bal-
ance against Singer in the West Side National Bank's ac-
count at the time the Wentworth Avenue Savings Bank
was closed out, of $1250.18, and that neither this balance
nor the amount of the three certified checks had ever been
paid to said bank.

Counsel for plaintiff in error first argue that Singer should have been granted a continuance and not forced to go to trial at the time he did. The record shows that Singer was indicted September 28, 1917, and the case was continued from time to time until October 7, 1918, when it came up for trial, and that attorneys Owens and Herson appeared in court on his behalf. Attorney Owens, former county judge of Cook county, stated that he was not the attorney of record in the case and had not intended to try it; that attorney Christensen, who was the attorney of record, was then engaged in the I. W. W. cases in the Federal court before Judge Landis and had been engaged there for some weeks before, and that plaintiff in error's case ought not to be forced to trial until after attorney Christensen was through with the trial of the I. W. W. cases. Judge Owens stated that he had only discussed the merits of the case briefly with plaintiff in error and had not attempted to go into the details and had not prepared for the trial and could not fairly present the merits of the case for the plaintiff in error. Attorney Herson stated that he had never tried a criminal case and only appeared for plaintiff in error as his friend; that he had understood that the case was to be settled along the line of a civil case; that there had been several civil cases started by the West Side National Bank against Singer and that he understood some agreement was to be made between the bank officials and Singer with reference to the settlement of the account, and he asked for a continuance until attorney Christensen should be prepared to take up the trial of the case for Singer. The trial judge stated that he had told Singer and one or both of the attorneys then present, two weeks before, in open court, that Singer must be prepared to have his case tried in the near future; that he had told Singer, in effect, that he could not grant him a continuance until Christensen finished the trial of the I. W. W. cases and that the case must go to trial. It appears that the trial was

entered upon at once, attorneys Owens and Herson remaining in court and looking after the interests of Singer until the verdict was reached.

Counsel for plaintiff in error argue that under the rule of the criminal court which states, in substance, that when the State's attorney or the attorney for the accused is necessarily engaged in the trial of a case in another court the case shall be passed until the assistant State's attorney or the attorney for the accused has finished his present engagement, this case should have been passed or continued; but the rule also states that a continuance shall only be granted in the sound discretion of the court and if the party asking for the delay shows that he used due diligence to be ready for the trial and would have been ready but for the engagement of counsel. This rule, fairly construed, is in accordance with the established practice in such matters. The question of granting a continuance because counsel is engaged in another case is largely in the sound judicial discretion of the trial court and will only be disturbed on appeal when it is shown that that discretion has been abused. (*Long* v. *People,* 135 Ill. 435; *Condon* v. *Brockway,* 157 id. 90.) We think it is clear from a reading of this record as to what took place at the time the judge insisted upon the trial going on, that there was no abuse of the discretion on the part of the trial court. Of course, no person accused of crime ought to be forced to the trial of his case without a reasonable opportunity to employ counsel and properly prepare for trial, but proper practice does not require, nor does the rule of the criminal court of Cook county, that if the counsel of record for the accused is engaged in another trial the trial must be put off indefinitely to permit his regular counsel to finish the other trial, if it appears that such trial will last for a considerable length of time thereafter. The trial judge had informed plaintiff in error, some two weeks before, that the case must be tried. In view of the nature of the case this would give

him time to employ other counsel and be properly prepared to try the case when it was called. We do not think any error was made by the court in compelling plaintiff in error to go on with the trial without waiting until after attorney Christensen was through with his work in the trial of the I. W. W. cases in the Federal court. Moreover, we think from the record that the interests of plaintiff in error were well taken care of by the attorneys who acted for him during the trial.

Counsel for plaintiff in error further argue that the court improperly admitted parol proof as to the contents of the three certified checks in question without first showing that the original checks could not be produced in court. This objection seems to be raised for the first time in this court. Furthermore, we think that the proof does show that the checks could not be found. The argument for the State is that these checks were sent for collection by the Federal reserve bank by mail to Singer's savings bank, and that, as Naso testified that as a rule all mail was opened by Singer, it is a fair conclusion that these checks were received by Singer and destroyed. It is true that Singer himself denied that he opened all the mail or that he knew anything about where these checks were. However that may be, we think the evidence in the record clearly shows that the checks could not be found and that therefore parol evidence as to the contents was admissible.

It is also argued by counsel for plaintiff in error that error was committed in the trial court in permitting the State's attorney to ask plaintiff in error on the witness stand if he had not previously been accused of a crime or misdemeanor, if he had not theretofore gone under assumed or different names, and if Judge Landis, of the Federal court, had not threatened to send him to jail for thirty days. The record shows that the first reference to his trouble with Judge Landis was brought out on the cross-examination of Naso by Singer's own counsel, and that the

examination by the State's attorney with reference to that trouble was made in an attempt to have him explain the details of it. We do not think it was proper for the State's attorney to ask plaintiff in error with reference to any other offenses or with reference to having gone under assumed names unless he had proof as to such matters and thereafter offered such proof and showed it to be material and admissible. In view of this record, however, we do not think that the action of the State's attorney in this regard is of such a nature as to cause a reversal of the case.

Counsel also complain of a statement made by one Healy, who, they allege, was one of the assistants in the prosecution of this case, that plaintiff in error was not a new man in the courts, either in the criminal or in the United States court. So far as we can judge from this record, Healy was not one of the attorneys in the case but was advising in the prosecution because he was the president of the West Side National Bank and knew the facts with reference to the transaction for which Singer was being prosecuted. This statement was made by Healy in open court in answer to the suggestions of attorney Herson about an attempted settlement with the bank, and was made for the purpose of refuting the statement of attorneys for Singer that he had not had sufficient time in which to properly prepare for the trial of his case and that therefore a continuance ought to be granted. In view of the statements made by attorney Herson on these questions we do not think reversible error was committed by this statement of president Healy as to Singer not being a new man in the courts. There is nothing in the record to show that any of the jurors who tried the case heard this statement of Healy. Indeed, it was made before the jury were called into the box, and the fair inference would be from this record that none of those who served on the jury heard it.

Counsel for plaintiff in error also insist that the interests of Singer were improperly prejudiced by an answer

of witness Naso when he was on the stand, to the effect that Singer had beaten Naso's old father out of $3500. This answer was volunteered by Naso when he was being cross-examined by the attorney for Singer and was promptly stricken out by the court on the motion of said attorney. Of course, the answer was entirely improper, but Naso was being sharply cross-examined in an attempt to show that he was as much responsible for the condition of the bank as Singer, if not more so, and it was quite natural that Naso should resent such questions. The fact that he volunteered such improper evidence was not reversible error.

It is further insisted by counsel for plaintiff in error that he was wrongly indicted for the confidence game; that his act, even though he was guilty, only made him guilty under section 102*d* of the Criminal Code, (Hurd's Stat. 1917, p. 973,) and that he could only be convicted under that statute for a misdemeanor, whereas under the Confidence Game statute he was convicted of a felony. If the transaction for which he was prosecuted was such as to show that he was guilty under the Confidence Game statute there was no error in trying and convicting him under such statute, even though he was also guilty, by reason of the same acts, under said section 102*d* of the Criminal Code. By the same act a party may be guilty of several offenses. The crime of murder may embrace an assault with a deadly weapon with intent to inflict a bodily injury, or an assault and battery. By the same act a person may be guilty of several distinct larcenies. *Freeland* v. *People,* 16 Ill. 380; *Nagel* v. *People,* 229 id. 598, and cases cited.

Counsel also argue earnestly that section 102*d* of the Criminal Code, heretofore referred to, being passed as a special statute, repeals the general statute on confidence game so far as it refers to fraudulent checks. We cannot so hold. Section 98 of the Criminal Code was passed for the purpose of covering confidence games, regardless of

whether or not a false or fraudulent check was part of the means, instrument or device used to carry out the scheme. The special statute passed in 1917 (sec. 102*d* of Crim. Code) was plainly enacted for the purpose of covering the intent to defraud by making or using in any way a check, draft or order for the payment of money upon any bank or other depositary when no sufficient funds were held by such bank or other depositary for the payment thereof. This last section of the Criminal Code had nothing to do with the crime of the confidence game and in no way referred to it. We shall have occasion hereinafter to refer to what is understood to be a confidence game under the Criminal Code of this State. It is plain on this record that the making of false or bogus checks was only one act in a series of acts which tended to prove that plaintiff in error had practiced the confidence game in swindling the West Side National Bank. It is true that if the legislature had enacted section 102*d* of the Criminal Code for the purpose of covering the same identical offense covered by said section 98, so far as it referred to fraudulent or bogus checks, then, under the reasoning of the authorities cited by counsel for plaintiff in error, (36 Cyc. 1152; 26 Am. & Eng. Ency. of Law,—2d ed.—738; *People* v. *Kipley,* 171 Ill. 44; *Deneen* v. *Unverzagt,* 225 id. 378;) there might be merit in their argument that plaintiff in error should have been indicted under said section 102*d* instead of being indicted for the confidence game, but the law is that a general act will not be repealed *pro tanto* by a subsequent special act when the two acts can stand together. (26 Am. & Eng. Ency. of Law,—2d ed.—743, and cases there cited.) Holding, as we do, that the proof shows that plaintiff in error was guilty of the confidence game by a series of acts which, taken together, so prove, we cannot hold, on this record, that he was simply guilty of violating the provisions of section 102*d* in passing fraudulent checks upon a bank when he did not have sufficient funds in bank to pay such checks.

Counsel for plaintiff in error earnestly argue that there is no competent evidence in the record showing that plaintiff in error was guilty of the confidence game. This court has stated more than once that any scheme whereby a swindler wins the confidence of his victim and swindles him out of his money by taking advantage of such confidence is a confidence game. (*People* v. *Poindexter,* 243 Ill. 68; *Morton* v. *People,* 47 id. 468; *DuBois* v. *People,* 200 id. 157.) The use of valid contracts in a swindling scheme does not prevent said scheme from being a confidence game. (*Chilson* v. *People,* 224 Ill. 535.) In the present case plaintiff in error had two bank accounts, according to his own testimony, before he opened his account with the West Side National Bank. The evidence shows that there was never any money in Klein's account in the Wentworth Avenue Savings Bank; that in order to show there was money in that account, at the direction of plaintiff in error his assistant cashier had made a number of false entries in the books; that thereafter plaintiff in error, pursuant to a scheme, sought to cash checks in the West Side National Bank to a much greater amount than the actual amount of money in his bank; that he told the West Side National Bank officials that M. Klein was a rich man on the north side, when Klein was a fictitious person. The evidence shows, without contradiction, that Singer's bank was at that time in a failing condition, and tends strongly to show that it was unable to pay its depositors, and that, as he himself admits, he was rapidly losing his depositors on account of the agitation against private banks, and while there is merit in the suggestion that a business man of reasonable sense would not attempt to get the money from the West Side National Bank in the manner contended by the State, yet we think the evidence conclusively shows that Singer did attempt to get the money from the West Side National Bank in the way contended for by the State when he did not have any cash or other assets in his bank suf-

ficient to pay the three certified checks here in question. While it is true that the vice-president of the West Side National Bank stated at the time Singer complained because the $600 check was not cashed, that if they cashed the new check before the certified checks were paid they would simply be loaning him money, it is apparent from the record that Elenbogen would not have cashed this $600 check if it had not been for the fact that the three certified checks had been deposited by Singer with the West Side National Bank and that he was told by Singer that these certified checks had been already cashed by the Wentworth Avenue Savings Bank, and if Naso, as assistant cashier of the Wentworth Avenue Savings Bank, had not informed the officials of the West Side National Bank that these certified checks were good.   It is true that some of the principal incriminating testimony against plaintiff in error was given by his former employee, Naso, but it is not true that the evidence justifying his conviction depends solely upon the uncorroborated testimony of Naso.   There was much evidence in the record that tended strongly to support Naso's testimony as to the business of the bank and the condition it was in at the time of this transaction, and also to corroborate him as to the transaction with reference to the Klein account in the savings bank, and that said account was a "dummy" account, made up at the direction of Singer.   Indeed, Singer's own testimony in its material features corroborates Naso's testimony on many of the vital questions in the case.   The evidence fully justified the verdict of the jury and the judgment of the trial court.

We find no reversible error in the record.   The judgment of the criminal court will therefore be affirmed.

*Judgment affirmed.*