(No. 21965.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN HOFFEE, Plaintiff in Error.

*Opinion filed October 21, 1933—Rehearing denied Dec. 13, 1933.*

124

CREIGHTON & THOMAS, and VIRGIL W. MILLS, for plaintiff in error.

OTTO KERNER, Attorney General, CHARLES W. CREIGHTON, State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiff in error, John Hoffee, (herein called defendant,) was indicted, tried and convicted in the circuit court of Wayne county for an assault with intent to murder Walter H. Shaeffer by administering to him whisky containing a deadly poison, to-wit, strychnine sulphate. He has brought the record to this court for review by writ of error.

At the January term, 1930, of the circuit court defendant was jointly indicted with Raleigh Stanley. Stanley entered a plea of guilty and was sentenced to the Illinois State Reformatory. Defendant Hoffee entered a plea of not guilty, and a trial at the January term, 1931, resulted as above stated. He sued out a writ of error from this court, and the judgment was reversed on confession of error by the People. The error confessed was, that the

jury before which the case was tried had been selected from a panel drawn under the provisions of the invalid Women Jurors act of June 17, 1929. At the June term, 1932, of the circuit court the grand jury returned another indictment against Stanley and defendant charging the same offense that was charged in the first indictment. It is upon this second indictment that defendant stands convicted.

The uncontradicted evidence for the People shows that on the afternoon of Monday, December 2, 1929, Raleigh Stanley at the home of Walter H. Shaeffer gave to him to drink a half-pint bottle of liquor containing strychnine sulphate; that Shaeffer took one drink of the contents of the bottle and shortly afterwards became very sick and had convulsions. Two physicians were called to attend him, who testified that he was suffering from strychnine poisoning, and that they tasted the contents of the bottle given to Shaeffer by Stanley and that it contained strychnine sulphate. One of the physicians testified the contents of the bottle were very bitter and contained a sufficient amount of strychnine poisoning to cause death if taken internally.

Raleigh Stanley, a witness for the People, testified substantially as follows: He was twenty-two years old on the day he testified, January 23, 1933. In 1929 he lived with his parents at their home in Centerville, in White county. He had known defendant, a traveling salesman, six or seven years. He was jointly indicted with defendant in the indictment on which defendant was first convicted, entered his plea of guilty, and was by the judgment of the circuit court committed to the State reformatory at Pontiac, January 31, 1931. On November 25, 1929, at the store of Adam Brown, in Centerville, he had a conversation with defendant in which defendant promised to pay witness $500 if he would kill Walter H. Shaeffer. Defendant told him that the farm on which Shaeffer was living had been deeded to Shaeffer for life and that at his death it was to go back to the Hoffee heirs, and that Oscar

Hoffee, defendant's uncle, would pay for killing Shaeffer. After some further conversation and persuasion on the part of defendant, witness agreed that he "would take the job." He was to meet defendant at his home on Thanksgiving day, November 28, 1929. On that day he left his home in Centerville in the morning and rode in a car driven by Robert Brown to Grayville, in White county. A girl employed by Brown's father also rode in that automobile from Centerville to Grayville. From Grayville witness rode on a train to Mt. Carmel, in Wabash county. From Mt. Carmel he rode on a bus to Fairfield, in Wayne county, and stayed all night with defendant at his home near the west part of that city. The next morning, Friday, November 29, 1929, defendant gave him the half-pint bottle containing the poison which witness later gave to Shaeffer. Defendant told witness to give the bottle to Shaeffer and said that it contained poison which would kill him. He and defendant then rode to Mt. Vernon on a truck of the Sexton Trucking Company. Defendant and the driver and witness had breakfast in the same restaurant. Defendant paid for witness' breakfast and gave him $20. Witness was to buy an automobile and drive it to Shaeffer's home, about two and a half miles southeast of Fairfield, in Wayne county, and give him the poisoned liquor. He was then to meet defendant in East St. Louis, at Mayberry's office. The price of the automobile was so high he could not buy it. He hired a taxi in Mt. Vernon and rode to Albion, in Edwards county. He hired another taxi in Albion and rode to West Salem to see his brother-in-law, Harley Baker. From West Salem he went to Mt. Erie with Allen McDowell to see a girl, Mildred Bean. He did not get to see her but he talked to her later over the telephone. He returned to West Salem that evening and stayed all night with his brother-in-law. The next day, Saturday, November 30, 1929, he rode with his brother-in-law to Fairfield. From Fairfield he rode to East St. Louis to see defendant

but could not find him. He stayed all night with his brother. The next day, Sunday, December 1, he came back to Fairfield on a bus and went to the home of defendant, where he stayed all night. The next morning, December 2, 1929, defendant took him to a filling station at the west side of Fairfield and told him to get out and walk to the Night Hawk Inn, east of Fairfield, so nobody would see him with defendant. Defendant bought a bottle of whisky, and then witness and defendant rode in a paneled-body Chevrolet truck to a place on a road which ran south of the farm on which Shaeffer lived and southeast of Shaeffer's house. The truck had a blue body with a yellow stripe around it. There was snow on the ground and there had been no traffic over that road after the snow had fallen. He saw some buildings west of the place where he left the truck but noticed none on the road they traveled. Defendant gave him the bottle of whisky which defendant bought at the garage that morning. Witness already had in his pocket the bottle of poisoned liquor defendant gave him at his home on November 29. Defendant told witness to walk to Shaeffer's house from the place where he got off the truck and to walk to defendant's home when he "got the job completed," and when leaving Shaeffer's home to walk in a southwesterly direction to the railroad, then up the railroad to Fairfield, and then west to defendant's home. He walked to Shaeffer's house and introduced himself to Shaeffer as Carl Johnson. He talked a while to Shaeffer and then they drank about two-thirds of the bottle of whisky that defendant had bought that morning. He then gave Shaeffer a drink out of the bottle of poisoned whisky that defendant had given him on Friday, November 29. Shaeffer took a drink from the bottle and asked witness what was wrong with it. Witness told him if there was anything wrong with it he did not know it, and then took the poisoned liquor from Shaeffer and tasted it but

did not swallow any of it. Witness was handed People's exhibit No. 1 and was asked if that was the half-pint bottle which contained the poison that defendant gave him. He answered that he could not say that it was; that it would look like the bottle which the poison was in if it did not have "these labels on it," and that the contents of the bottle looked like the fluid that was in the flask of poisoned liquor from which Shaeffer took a drink. He remained at Shaeffer's house five or ten minutes after he gave him the drink of poisoned liquor. Before leaving he took the liquor into Shaeffer's kitchen and set it on a small table. He then walked to defendant's home as he was directed to do by defendant and arrived there around 3:30 in the afternoon. About thirty minutes later defendant came in. His wife and two very small children were at home during the time witness was there. Defendant gave him $12 more. He then told witness to walk down the road, flag a bus and go to East St. Louis, and that he would meet witness there the next morning and send a telegram to his uncle Oscar, who would send him the balance of the $500 promised him. He also told witness that when he got to East St. Louis to register at the Broadview Hotel as Jack Taylor and that defendant would call for him by that name. Witness left defendant's house, walked down the road, met and rode with Rube Williams, of Wayne county, to Mt. Vernon, where he stayed all night. The next morning, Tuesday, December 3, he went to East St. Louis and registered at the Broadview Hotel under the name of Jack Taylor. Defendant did not meet him there and witness could not find him in East St. Louis. Witness stayed Wednesday night with his brother and the next morning rode in a bus to Albion, arriving there about one o'clock P. M. From Albion he walked to his home in Centerville, reaching there Thursday night. On the following Saturday he was arrested by the officers on the charge of poisoning Shaeffer with intent to kill him.

Other witnesses for the People testified substantially as follows:

E. V. Mayberry: In the year 1929 he was engaged in the real estate business in East St. Louis. He had known defendant for a number of years and had read of the poisoning of Shaeffer in a Wayne county newspaper. After that time he saw defendant frequently at the Broadview Hotel, in East St. Louis. Defendant was living there and was sick. Witness had frequent conversations with him in which he said that his uncle Oscar got him into "this trouble" and was refusing to help him get out of it. He read to witness a letter he had written to Oscar in Texas on the stationery of the hotel, the substance of the letter being that he was in this trouble and indicted and was wondering why he (Oscar) did not come to his rescue and put up some money to fight the case or come and help him fight it. He further wrote his uncle that he was in the hotel, sick and needing help—broke—and wanted him to come and get him out of it.

Hattie Keen: Some time in July, 1930, late one afternoon she was "taking a drive" with William Bowman. They met defendant, and he and Bowman had a conversation in which Bowman asked him if he had seen his uncle Oscar lately. Defendant replied that he had not, and then stated to Bowman that Oscar had been the cause of all his trouble, and that he was going to turn State's evidence against him and tell everything he knew. Bowman replied, "If you will do that, John, I would feel like buying you a new shirt."

William Bowman: In the fall of 1930, when he was in company with the widow Keen, he met defendant and had a conversation with him. He asked defendant if he was going through with this case and going to the "pen" and let O. T. (meaning Oscar Hoffee) slip out. Defendant replied that he did not know exactly what he was going to do, and that he had two or three different ways to get

out of his trouble. He also said to witness that his uncle Oscar was a meaner man than Shaeffer. Witness did not remember anything else that was said in that conversation.

Everett Penrod: In February, 1929, he was working for his father, Thomas Penrod, who had a grocery store and filling station in Albion. Defendant called on his father regularly to sell him candy and other merchandise. In February, 1929, at his father's store, defendant asked witness if he knew any "crooks" in Springfield. He stated that his uncle Oscar was having trouble with Shaeffer; that his uncle was so afraid of Shaeffer that he dared not go out after sundown, and that he wanted to get someone to kill Shaeffer. He offered witness $250 if he would get someone from Springfield to kill Shaeffer. He offered to furnish an automobile to witness to drive to Springfield and bring back a man to do the killing. Witness refused to accept this offer. About a week later defendant came to the store and offered to give witness $500 if he would get someone to kill Shaeffer. Thomas Penrod related the conversations between defendant and his son in substance as it was testified to by his son. On cross-examination these two witnesses were asked if they did not at the former trial of defendant testify that the conversations occurred in February, 1928. They at first answered that they did not so testify but admitted that they might have fixed the date as in February, 1928. They were positive that defendant had those conversations with Everett Penrod at about 4:30 o'clock P. M. on some day in February, 1929. The court reporter who took the evidence at the former trial testified that the two witnesses testified that the conversations with defendant took place in February, 1928.

Gilbert Butler: In the summer of 1930, defendant, in the company of Shod Moore, came to his home and he had a conversation with him, in which defendant asked him if he was not a good friend of Shaeffer's. Witness

replied that he was. Defendant then stated that he had been informed that witness would be a good man to fix his case with Shaeffer, and asked witness to tell Shaeffer that if he would "fix it up" he would give him $2000. He reported defendant's offer to Shaeffer, and Shaeffer answered, "there wasn't anything doing." Witness later informed defendant that he had seen Shaeffer and told him what Shaeffer's answer was. On cross-examination he was asked if he did not at the former trial testify that after his first conversation with defendant he made no report to him of the result of his interview with Shaeffer. He stated that he did not so testify. The court reporter testified that witness said at the former trial he did not report back to defendant that he had talked to Shaeffer about defendant's offer to pay $2000 to "fix the case."

Margaret White, Earl Robinson and Ethel Robinson, his wife, neighbors of Shaeffer, testified that on December 2, 1929, the roads were rough and frozen and were lightly covered with snow; that there had been no traveling along the roads for several days; that shortly after noon on December 2, 1929, a dark paneled-body truck came south on the road leading from the Night Hawk Inn at Fairfield and went west along the road which ran south of the farm on which Shaeffer lived. Mrs. Robinson described the truck as having a dark-blue color.

Fred Davis: In November and December, 1929, he was employed as a truck driver by the Sexton Trucking Company, which hauled candy and other merchandise that defendant had sold to customers. Defendant had the privilege of riding on the trucks of that company. Early one morning, about the time that Shaeffer was poisoned, witness stopped the truck he was driving in front of defendant's home. Defendant and another man got in the truck and rode with him to Mt. Vernon. He did not know the other man. He was a "young-like fellow" who had a blanket over his shoulders. At Mt. Vernon witness and

defendant had breakfast together. Defendant rode with witness from Mt. Vernon to East St. Louis, but witness did not see the other man after they got to Mt. Vernon. He could not say for sure whether this trip was made before or after Shaeffer was poisoned.

Defendant and four other witnesses testified in behalf of defendant substantially as follows:

The defendant: He was thirty-eight years old, married and had three children. He had lived in Wayne county all his life. In November and December, 1929, he lived about a mile west of Fairfield with his family and was a salesman working for himself. He had known Raleigh Stanley for five or six years. He had never had any trouble with Walter Shaeffer. They were friendly up until the time Shaeffer was poisoned. He did not on November 25, 1929, at Centerville or at any other time or place, make any arrangements with Stanley to have him poison Shaeffer. He never had the conversations with Everett Penrod in the presence of his father testified to in their evidence for the People. After the first trial Thomas Penrod talked to him in Grayville and told him that the evidence he had given against him was "manufactured," and that if the case were tried again he would not be a witness against him. On Thanksgiving day, November 28, 1929, witness took his mother to Mt. Vernon to see a doctor. He returned to Fairfield and had dinner with his father and mother at the home of his sister and her husband in Fairfield and did not return to his home until five or six o'clock that evening. On the same day his wife had dinner with her parents and was not at home until late in the evening. Stanley did not stay at witness' home that night. On Friday and Saturday, November 29 and 30, 1929, he was working, calling on customers and driving his truck. Late in the evening of November 30, about two and one-half miles east of Burnt Prairie, in White county, his truck slipped off of the road and the rear end was torn off. He

walked to the home of J. E. Pollard and employed him to pull the truck to Burnt Prairie. He had Mrs. Pollard call Clyde O'Leary, a garage man in Fairfield, and asked him to come to Burnt Prairie to get the truck. Pollard pulled the truck to Burnt Prairie and O'Leary pulled it from there to Fairfield. It was necessary to order some parts from St. Louis to repair the truck, and it was in O'Leary's garage until the middle of the next week. He never rode from his home to Mt. Vernon in a truck with Stanley and did not go to Mt. Vernon on a Sexton truck the morning of November 29, 1929. He did ride in one of the Sexton trucks driven by Fred Davis from his home to Mt. Vernon in company with another man one morning, but it was not the 29th day of November and the man was not Stanley but was a stranger that witness met on the road and who wanted to get a ride to Mt. Vernon. Witness did not drive Stanley in a truck to the road south of the farm on which Shaeffer lived, on December 2. He did not give Stanley any poisoned liquor to give Shaeffer and never gave Stanley any money as Stanley testified he had done. Witness saw E. V. Mayberry at the Broadview Hotel, in East St. Louis, several times after Shaeffer was poisoned. Mayberry was drunk every time witness saw him. Witness did not write Oscar Hoffee any such letter as that about which Mayberry testified, and he never gave Mayberry a letter to read that he wrote to his uncle Oscar. Witness went to see Gilbert Butler at the suggestion of Shod Moore, who had suggested to him that Butler might be able to help him get out of his trouble. Butler told witness that if he would give him $100 he could buy off Shaeffer for $2000. Witness never saw Butler or talked to him about the matter after that time. He did have a conversation with William Bowman some time in 1930, but he never said anything about his uncle Oscar having got him into trouble or about turning State's evidence, and Bowman never told him that he would get him a new shirt.

J. E. Pollard: Late one evening in the latter part of November, 1929, defendant came to his home, which is near Burnt Prairie, and employed him to pull defendant's truck from a place where it was broken down, to Burnt Prairie. The day on which he pulled the truck to Burnt Prairie was before Thanksgiving.

Clyde O'Leary: In November and December, 1929, he was running a garage in Fairfield. One night about Thanksgiving, 1929, he went to Burnt Prairie and pulled defendant's truck from there to his garage in Fairfield. The body of the truck had a dark-blue color with a cream-colored stripe around it. He was not sure what day it was and kept no record of the day, but his impression was that it was on Saturday night. It required several days to repair the truck. This witness identified a receipted statement he had given defendant, dated November 30, 1929, which showed a charge of four dollars under that date for towing and of $21.25 under date of December 2 for parts and labor. The statement was marked, "Paid, 12-3-1929." Witness stated that he did not know the day on which the bill was paid; that it was made out in his handwriting; that while there appeared to have been some erasures in the date of the statement it seemed to be in his handwriting.

Harry Savage: He was a farmer living near Centerville and was acquainted with Raleigh Stanley. On Thanksgiving day, 1929, he shucked some corn and sold some of it to Stanley's mother. Stanley was at Brown's store, in Centerville, on that day and about noon helped witness to sack the corn that was sold to Stanley's mother. Savage's testimony that Stanley was in Centerville about noon on Thanksgiving day, 1929, is corroborated by the testimony of Adam Brown. George Lee also testified that he saw Stanley at Brown's store with Savage, sacking some corn, about Thanksgiving day, but he was not sure that it was on that day.

Robert Brown: He has lived at Centerville all his life and knows Raleigh Stanley. He was bird hunting on Thanksgiving day and did not take Stanley from Centerville to Grayville in his car on that day. He was not asked to state, and did not state, that he did not take him to Grayville about or near that date. He did not remember seeing Stanley on Thanksgiving day.

The testimony of the following named witnesses for defendant tends to corroborate Stanley as to his whereabouts on November 29, 1929: Allen McDowell said he remembered seeing Stanley at Harrison's motor garage in West Salem, where witness was working, about November 29, 1929. Mamie Reynolds testified she saw Stanley in West Salem about November 29, 1929, and that he and McDowell drove to the store in which she worked, in the afternoon of that day. Mildred VanDevender said she remembered that Stanley called her by telephone about November 29, 1929, at Mt. Erie. Harley Baker stated that Stanley stayed all night at his home on November 29, 1929, and that he took him in his car to Fairfield the next day.

In rebuttal for the People the following named witnesses testified in substance as follows:

Verla Johnson: She knew Robert Brown and Raleigh Stanley. She was working on Thanksgiving day, 1929, for Adam Brown, at Centerville, a part of that morning and rode with Brown and Stanley to Grayville, her home, to take dinner with her parents. They arrived at Grayville about 11:00 o'clock A. M. Her name at that time was Verla Hallam. She did not ride with George Riley to Grayville that day.

Pearl Pollard: She called Clyde O'Leary's garage for defendant, who asked for aid to get his car to Fairfield. She does not remember what date it was but does know that the call was made before Thanksgiving day in 1929.

Carson Pollard: He is a brother of J. E. Pollard, who pulled the injured truck for defendant to Burnt Prairie

when the car was towed there. It was not on Saturday, November 30, 1929, when that occurred but it was the night before Thanksgiving day in 1929.

Thomas Penrod: He denied that he told defendant that witness' evidence on the former trial was manufactured and that he would not testify against defendant if the case was tried again.

Gertrude Nash: She is the daughter of Thomas Penrod and stated she was present when her father and defendant had the conversation about her father's evidence in the former trial in this case, and that it is not true her father said his evidence was manufactured and that he would not be a witness if the case was tried again.

Frank Vaught and his wife, Sarah Vaught, both testified that they saw Raleigh Stanley in Grayville on Thanksgiving day, November 28, 1929, about 11:00 o'clock A. M., at the Big Four depot—the railroad that leads to Mt. Carmel. Vaught also testified that he heard the call on the telephone by defendant on Saturday night, November 30, for some one from a garage to meet him and pull his car to Fairfield.

Clyde O'Leary, recalled by defendant, testified: He could not positively say when he made out the bill introduced as defendant's exhibit "1." He kept no record showing the date the towing and work were done on the truck. He could not say that the date written in the upper left-hand corner of the statement, "Nov. 30," was in his handwriting. It is not "my custom to write small" letters and figures as written in that date. The other date in the left-hand corner, "Dec. 2," looks more like his writing, but he could not say that either one of those dates is his writing. The figures "30" in the date at the top of the statement, "Nov. 30, 1929," might possibly have been erased. He does know that "Nov. 1929," is in his handwriting.

Defendant's exhibit "1" was signed by Clyde O'Leary, and is substantially in the following form and contains the following words and figures:

(Corner Torn)' "RFIELD, ILL., *Nov. 30, 1929.*

John Hoffee, in account with O'Leary & Son.

| | | |
|---|---|---:|
| Nov. 30 | Toeing ................................. | $ 4.00 |
| Dec. 2 | Ring gear pinnion........................... | 7.00 |
| | Drive shaft .............................. | 4.25 |
| | Grease .................................. | .75 |
| | Drive shaft bearing......................... | 2.25 |
| | Labor on installing rear end................. | 7.00 |
| | | $25.25 |

Paid 12-3-1929"

The foregoing evidence is the substance of all the material evidence introduced on the trial. The testimony of several witnesses for defendant has not been set forth because it does not tend to prove any fact in issue or to contradict any witness for the State on any question of fact arising on the record.

Before the trial defendant made two separate motions for a continuance. The first of these motions was made on the ground of the absence of Thomas H. Creighton, one of his attorneys. Creighton's absence was alleged to be due to the fact that he had accompanied his wife to Washington, D. C., where she was to undergo a surgical operation. The abstract of the record does not show that the motion was verified or supported by proof of the facts stated in it or that there was any ruling of the court made on it. The other motion for continuance was made on the ground of the illness of defendant, and was supported by the testimony of two physicians, who stated that they had examined defendant and found him nervous and nauseated, that he had a temperature of 97 degrees and a pulse rate of 100, and that they did not think he was physically able to go through a trial. The court did not err in overruling these motions. There is no sufficient showing in the record that defendant's condition was such that he could not or did not properly protect his rights in the selection of the jury and during the trial. The case had been tried before, and defendant was on this trial represented

by able attorneys. The granting or refusing of a continuance was a matter within the discretion of the court, (*People* v. *Singer*, 288 Ill. 113; *People* v. *LeMorte*, 289 id. 11;) and the circumstances represented to us do not show its discretion was abused.

It is contended that the court erred in overruling defendant's objections to the testimony of Walter Dietrichs, a chemist in the bureau of industrial alcohol of the Treasury Department of the United States government at St. Louis. He testified for the People that on March 24, 1930, he analyzed the contents of a bottle shown to him by the State's attorney, supposed to be the same given by Stanley to Shaeffer, and found it to contain 50.75 per cent alcohol and 2.13 grains of strychnine sulphate per fluid ounce. The objection of defendant to this evidence was, that it did not show that the contents of the bottle when analyzed by the witness were the same as when given by Stanley to Shaeffer. We do not deem it necessary to set out the evidence introduced to prove that the contents of the bottle were the same as the contents of the bottle given by Stanley to Shaeffer and by which he was poisoned. The uncontradicted evidence of Shaeffer, the physicians who attended him, and other witnesses for the People, establishes conclusively that Stanley gave Shaeffer a bottle containing liquor having a sufficient content of strychnine sulphate to cause death if taken internally; that Stanley induced Shaeffer to drink of the contents of the bottle, and that he did drink of it and was thereby severely poisoned. By the record in this case, ignoring all the testimony of Dietrichs, those facts are established beyond all reasonable doubt, and if the evidence of Dietrichs was improperly admitted for the reasons alleged, the error was one that in nowise prejudiced the rights of defendant and could not have influenced the jury in reaching its verdict. It is therefore unnecessary to decide whether or not the testimony of Dietrichs was competent and admissible.

Shaeffer, as a witness for the People, testified, over the objection of defendant, that on December 2, 1929, he had "a lifetime dower" in the farm on which he then lived, and that there were some liens against the land which were held by Oscar Hoffee, who was his brother-in-law and an uncle of defendant. It is contended by defendant that it was error to admit this evidence. The evidence in some degree tends to support the other evidence of the People that defendant's motive for wanting to have Shaeffer killed was to assist his uncle in getting rid of Shaeffer. While it is not necessary for the People to prove that defendant had a motive for committing the crime with which he is charged, the presence of a motive for defendant to commit the crime charged is important in considering whether he did commit it. *People* v. *Looney,* 324 Ill. 375.

During the cross-examination of defendant by O'Neal, an attorney assisting the State's attorney, one of defendant's attorneys asked to have the record show that Stanley was sitting beside O'Neal, aiding him in the conduct of the case and in the cross-examination of defendant. O'Neal stated that Stanley had not said a word to him about the case. The court denied the motion and said, "As I understand it, the witness Raleigh Stanley was brought here by the court and has a right to the court room." It is contended that this ruling and remark of the court were improper and prejudicial to defendant. No reasons are given why the ruling and remark of the court were improper and it is not apparent that defendant was prejudiced thereby. The contention cannot be sustained.

There was evidence showing that Bernice McNeely was living at defendant's home in November and December, 1929. One witness for defendant testified that Miss McNeely was in Detroit. The witness was then asked, "What is the condition of her health?" Another witness for defendant, after having testified that Miss McNeely was in Detroit, was asked, "How long has she been there?" Ob-

jections to these questions by the State's attorney were properly sustained. It is contended that by these questions defendant attempted to show his inability to have Miss McNeely as a witness and show by her that Stanley did not stay all night at his home on the two nights before Shaeffer was poisoned. Defendant in his brief says that he offered to show how long Miss McNeely had been in Detroit and that her condition of health was such that he could not secure her attendance as a witness. We find in the record no such offer of proof. The record does not show that defendant's attorneys advised the court of the purpose of the questions, nor does it show that the court knowingly refused to allow proof that Miss McNeely was not available as a witness.

Stanley testified that he went from his home to Grayville on the morning of Thanksgiving day in an automobile driven by Robert Brown, and that a girl employed to work at the home of Brown's father, Adam Brown, also rode in the car. Robert Brown, as a witness for defendant, testified that he was hunting all that day and did not drive Stanley to Grayville. In rebuttal the People called Verla Hallam, who testified, over defendant's objection, that on the morning of Thanksgiving day she rode to Grayville with Stanley in an automobile driven by Robert Brown. Her evidence was properly admitted in rebuttal of the evidence of Robert Brown. In sur-rebuttal defendant attempted to show by a daughter, a son and a grandson of Adam Brown that Verla Hallam left the home of Adam Brown to go to Fairfield on Thanksgiving morning in a car driven by George Riley. Objections of the State's attorney to this evidence were properly sustained on the ground that it should have been introduced by the defendant when introducing his evidence in chief. Defendant, when introducing his evidence in chief, knew that Stanley had testified that he went to Grayville with Verla Hallam in a car driven by Robert Brown. All of defendant's evi-

dence tending to contradict Stanley's testimony should have been introduced in chief.

The evidence of the two witnesses for the People introduced over defendant's objections in rebuttal, that they saw Stanley at the railroad depot in Grayville on Thanksgiving morning, 1929, was properly admitted by the court. This evidence contradicted the evidence of witnesses for defendant that Stanley was in Centerville about noon on that day, sacking corn, and was proper evidence in rebuttal.

It is contended that the proof of the guilt of defendant is insufficient to sustain the verdict of the jury. The ultimate question in the case is whether Stanley poisoned Shaeffer at the solicitation or instigation of defendant. The only direct evidence for the People on that question is the testimony of Stanley, by his confession the actual perpetrator of the crime. On the other hand, the only direct evidence in contradiction of Stanley on that question is the testimony of defendant himself. It is not necessary to repeat or discuss at length the other evidence which tends to corroborate or to contradict in minor detail the testimony of Stanley. That evidence tends more strongly to support than to impeach the testimony given by that witness. The description of the truck in which Stanley says defendant drove him to the farm of Shaeffer on the day of the crime, and of the truck that three witnesses for the People saw on the roads near Shaeffer's farm on the day of the poisoning, is a description that fits the truck which the testimony shows defendant owned on that day. There is, however, no direct evidence that that truck was the truck of defendant. Stanley did not so testify. If on that day defendant's truck was in a garage and was being repaired, as defendant attempted to show by evidence introduced by him, that fact does not establish the innocence of defendant, because he may have used another truck hired or borrowed by him in which to drive Stanley to Shaeffer's farm. The testimony of defendant, and of the witnesses who

corroborated him, that he and his wife were not at home on Thanksgiving day until between five and six o'clock in the evening, is of no importance in the case and does not contradict Stanley's statement that he stayed at defendant's home on Thanksgiving night, because Stanley testified that he arrived at defendant's home on that evening between six and seven o'clock. Proof of the guilt of defendant in this case does not rest solely on the testimony of Stanley. The evidence of defendant's conversation with Everett Penrod, of his statements to Mayberry, and of the letter which Mayberry testified defendant wrote to Oscar Hoffee, of defendant's conversation with William Bowman, and of his attempt to have the case disposed of by paying $2000 to Shaeffer, is proof of circumstances and facts which tend strongly to show that defendant is guilty. It is true that the testimony of the court reporter who took the evidence at the former trial of defendant shows that at that trial the Penrods testified that the conversations of defendant with Everett Penrod occurred in 1928, while their evidence as shown in this record is that those conversations took place in February, 1929. The discrepancy in their testimony at the two trials is not such as to render their testimony unworthy of belief or consideration in this case. The law is that the testimony of an accomplice is subject to grave suspicion and should be acted on with great caution, (*People* v. *Johnson,* 317 Ill. 430; *People* v. *Harvey,* 321 id. 361;) but such testimony is competent evidence, and, even where uncorroborated, may be sufficient to sustain a conviction if it is of a character to prove guilt beyond a reasonable doubt. *People* v. *Maggio,* 324 Ill. 516; *People* v. *Gallery,* 336 id. 580.

We have examined and carefully considered all the evidence in this record and are convinced that the jury were warranted in their finding that the guilt of defendant was proven beyond a reasonable doubt.

Defendant complains of several instructions given for the People. The first of those instructions was condemned by this court in *People* v. *Ambach,* 247 Ill. 451, because in that case there was no circumstantial evidence tending to prove guilt. There is such evidence tending to prove guilt in this case, and the court did not err in giving the instruction. Another instruction given by the court concerning the testimony of an accomplice was held to be erroneous in the case of *People* v. *Rongetti,* 338 Ill. 56. In other instructions given for defendant the jury were told that the testimony of an accomplice is liable to grave suspicion and should be acted upon by the jury with great caution. In view of that fact, and the further fact that the testimony of Stanley was well corroborated by other witnesses, we hold that the giving of this instruction was not reversible error. The contention of defendant that the court improperly refused to give for him another instruction cannot be sustained, because the substance of the instruction was embodied in other instructions given by the court. There was no other error committed by the court in giving instructions for the People except the giving of some abstract propositions of law as instructions in which the law was correctly stated. The instructions as a whole given by the court correctly informed the jury of the law applicable to the case.

It is not the province of a court of review in a criminal case to determine whether the record is free from error or to reverse a judgment because some error may have been committed, but rather to determine whether or not the accused has had a fair trial under the law and has been proven guilty beyond all reasonable doubt. (*People* v. *Stavrakas,* 335 Ill. 570.) The record shows that the defendant had a fair trial and that none of his fundamental rights were denied him.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*