NO. 4-07-0681

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| SANDRA G. DOWNEY, n/k/a SANDRA G. HART, | ) | Appeal from |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| GARY DUNNINGTON, M.D., and SIU PHYSICIANS | ) | No. 02L331 |
| AND SURGEONS, INC., | ) | |
| Defendants-Appellees. | ) | Honorable |
| | ) | Robert J. Eggers, |
| | ) | Judge Presiding. |

_____

MODIFIED UPON DENIAL OF REHEARING

JUSTICE APPLETON delivered the opinion of the court:

Plaintiff, Sandra G. Downey, sued a surgeon, Gary Dunnington, and his

employer, Southern Illinois University (SIU) Physicians and Surgeons, Inc., for medical

malpractice. This is an informed-consent case. The jury returned a verdict for the

defendants, and plaintiff appeals. She argues the trial court erred in certain rulings it

made before and during trial. She also argues the verdict is against the manifest weight

of the evidence and, for that reason, the court should have granted her a new trial. We

find error in two evidentiary rulings; but we conclude that if the court had ruled the

other way, the verdict would have been the same. Because the verdict has some basis in

the evidence, we find no abuse of discretion in the denial of plaintiff's motion for a new

trial. Therefore, we affirm the judgment.

I. BACKGROUND

A. The Second Amended Complaint

The second amended complaint has two counts. The first count is against Dunnington and sounds in professional negligence. The second count is against SIU Physicians and Surgeons, Inc., and sounds in respondeat superior.

The factual allegations in count I, incorporated into count II, are as follows. On February 14, 2000, plaintiff had an appointment with a physician, Elvin Zook (who is not a party to this case). Plaintiff's mother, Betty Hart, came along with her to this appointment, and Zook wrote down in plaintiff's medical records that Betty had a history of bilateral breast cancer. Actually, that information was incorrect: Betty never had cancer in both breasts. Zook referred plaintiff to Dunnington, and she went to her appointment with him on February 16, 2000. Dunnington wrote the same erroneous information in plaintiff's medical records--that her mother had bilateral breast cancer. He also wrote that plaintiff's mother and sister both had a history of ovarian cancer. That information likewise was incorrect: neither of them ever had ovarian cancer. Given the family medical history as Dunnington understood it, plaintiff was a candidate for genetic testing to determine whether she was genetically predisposed to develop breast cancer. Dunnington told her that the Department of Public Aid would not cover genetic testing. He failed to inform her, however, of the grants that were available to cover genetic testing. He recommended bilateral prophylactic mastectomies "as a treatment option." Plaintiff alleges "[i]t was not the accepted standard of care, among reasonably well[-]qualified surgeons[,] to recommend prophylactic mastectomies for patients who had risk factors similar to [plaintiff's] actual risk factors." Relying on Dunnington's erroneous advice and "unaware that she was not at very high risk for contracting breast cancer," plaintiff agreed to bilateral prophylactic

- 2 -

mastectomies, which Dunnington performed on March 17, 2000.  In the same surgery, Zook inserted breast implants and reconstructed plaintiff's breasts.  A pathological examination of breast tissue from the surgery revealed no malignancy.

Paragraph 23 of counts I and II accuses Dunnington of medical malpractice.  It reads as follows:

"23. *** [A]t the same time and place mentioned in the preceding paragraphs, the [d]efendant, Gary Dunnington, M.D., notwithstanding his duty to act as a reasonably careful physician, committed one or more of the [following] negligent acts or omissions:

(a) failed to properly investigate [p]laintiff's family history of cancer[,]

(b) failed to refer [p]laintiff for genetic testing[,]

(c) allowed considerations of [p]laintiff's ability to pay for genetic testing to affect the manner in which he presented treatment options to the [p]laintiff[,]

(d) failed to inform [p]laintiff that grants were available to obtain genetic testing[,] [and]

(e) performed prophylactic mastectomies on the [p]laintiff without

- 3 -

sufficient medical indications."

The second amended complaint alleged that as a result of such negligence, "both of [p]laintiff's breasts were removed and breast implants were inserted[;] [she] developed seroma and a staphyloccus infection[,] requiring removal of the implants and further hospitalization[;] [she] has been permanently disfigured for life[;] [and she] underwent removal of her ovaries and uterus." In further consequence, she "missed significant time from work endeavoring to be healed of her injuries"; she "[has] experienced[,] and will continue to experience[,] pain and suffering"; and she has incurred medical bills and will continue to incur them.

### B. The Affirmative Defense

The affirmative defense alleges that the misinformation was plaintiff's fault. Defendants plead as follows:

> "1. Sandra Downey had a duty to provide accurate information to the [d]efendants.
>
> 2. Sandra Downey gave inaccurate information regarding her personal and family history.
>
> 3. In reliance on the information Sandra Downey provided, the [d]efendants offered treatment options[,] including bilateral prophylactic mastectomies."

### C. Defendants' Motion in Limine

On February 22, 2007, defendants filed a motion in limine, in which they sought to bar plaintiff from suggesting to the jury that Dunnington declined to refer her for genetic counseling because of her lack of funds. Specifically, the motion sought to

bar the following allegations from trial:

"4. Dr. Dunnington did not refer Sandra Downey for

genetic counseling because Medicaid/[p]ublic [a]id would

not cover the cost of genetic testing.

5. Dr. Dunnington did not refer Sandra Downey for

genetic counseling and testing because she was unable to pay

for those services."

On February 23, 2007, the trial court held a hearing on the motion in limine. Defendants' attorney told the court he was concerned that in her discovery deposition, plaintiff's medical expert, Barbara L. Weber, had offered an opinion in which she assumed facts having no basis in the evidence: she opined it would be a breach of the standard of care to refuse to refer plaintiff for genetic testing on the ground that plaintiff could not pay for it. But, according to defendants' attorney, the record was devoid of evidence that money had anything to do with Dunnington's not referring plaintiff for genetic testing. Defendants' attorney quoted Weber's discovery deposition, in which he asked her the following question:

"Q. What is your understanding o[f] the reasons

Sandra Downey did not pursue genetic testing?

* * *

[A.] My interpretation of the record[,] including the

deposition of Dr. Dunnington[,] was that it was his

impression that she was very likely to have a mutation and it

was very unlikely that Medicaid would cover the cost of her

- 5 -

testing[] and, therefore, he didn't follow up on referring her to the genetic counselors. Not that it didn't happen[,] but I am not aware that he tried to refer her and she refused to go.

It was my impression that he never referred her because of the reasons I just stated."

In Weber's opinion, "decisions about taking care of patients should not be made on the basis of their ability to pay." Defendants' attorney asked her:

"Q. And Dr. Dunnington and Dr. Zook did not do that, agreed?

A. My interpretation[,] as is on the record previously[,] is that one reason, if not the reason, that Dr. Dunnington did not refer Sandra Downey to the genetic counselors was his concern that she was not able to pay for that service and for the associated genetic testing. That was a significant factor.

From my interpretation of what I have been provided[,] that played a substantial role in the decision not to send her[,] and I don't believe that's the standard of care. And I do believe that if he sent her[,] neither Dr. Dunnington nor Sandra Downey would be in the mess that they are in right this moment."

Defendants' attorney argued to the trial court that the record contained no evidence to support Weber's "interpretation"--there was no evidence that Dunnington

- 6 -

tried to dissuade plaintiff from undergoing genetic testing, let alone that he did so because of her poverty. Citing our decision in <u>Coffey v. Brodsky</u>, 165 Ill. App. 3d 14, 24, 518 N.E.2d 638, 644 (1987), he argued that an expert should not "offer[] an opinion about *** facts which didn't exist." Just because Dunnington told plaintiff that public aid would not cover genetic testing, it did not follow that he denied her genetic testing; he was obligated to warn her that some procedures might not be covered. Defendants' attorney quoted Dunnington's discovery deposition, in which plaintiff's attorney referred to her client's "opt[ing] not to have" genetic testing:

"Q. Now, given the fact that Sandy didn't have money for the BRCA 1 [(breast cancer gene 1)] testing, do you believe it was a reasonable decision on her part to opt not to have it?

A. Again, I try [to be] very careful[,] as a breast[-]cancer surgeon[,] not to judge people's choices, because I'm dealing almost daily with patients [to whom] I've given recommendations and [whom I've] allow[ed] *** to make choices for whatever reasons they may choose.

Usually[,] when a patient chooses not to have genetic testing, the reason is that she believes[--]and we focus on this discussion as we're talking about it[--]usually[,] she believes that it would not impact her decision.

And my assumption here would have been[] that Sandra had pretty much[,] in her mind[,] committed that

- 7 -

that's the operation she wanted.

In my discussion with her[,] it was very clear she had already given a lot of thought about this.  She had talked to Doctor Green about it[--or to] Doctor Zook[,] at least[,] about the reconstructive options[--]and she was very emphatic that this option, in her opinion, was the best one for her.

And[,] so[,] I can only assume that's probably why the genetic testing was not a major factor, particularly when I said[] she still would be [at] an increased risk even if it were negative.

Q. You don't have any firsthand knowledge[,] though, of *** the *** specific reason why she [did] not opt[] for it?

A. That's correct.

Q. And, in fact, if it was the cost, the money, you wouldn't have any reason to doubt that, would you?

A. No."

Defendants' attorney also cited Dunnington's testimony that he was "very careful not to make decisions, recommendations, based on whether or not there [would] be payment for a procedure that [he did].  It [did not] enter into [his] decision."  In sum, defendants' attorney argued, all Dunnington did was simply "la[y] it on the line that if [p]ublic [a]id [did not] cover it, you may be personally responsible.  [Plaintiff] came back.  She chose the option of surgery.  She didn't choose genetic testing, and it wasn't a

matter of cost."

Plaintiff's attorney responded by citing plaintiff's testimony, in her discovery deposition, that the reason why she chose not to undergo genetic testing was she lacked the means of paying for it. Plaintiff's attorney also quoted the following question and answer in Dunnington's deposition:

"Q. Would you agree that if Sandy didn't have the $2,000, *** the BRCA 1[/] BRCA [2] testing was not an option for her[?]

She didn't have the money, she couldn't get the test?

A. Correct."

After reviewing the testimony with the attorneys and hearing their arguments, the trial court saw no evidence that plaintiff's lack of funds was the reason why Dunnington did not refer her for genetic testing (although lack of funds might well have been the reason why she declined genetic testing); Dunnington merely told plaintiff an economic fact: these were expensive procedures, and she would have to pay for any procedures that public aid did not cover. Plaintiff's attorney responded:

"MS. de SAINT PHALLE: But he also told her[,] ['W]e can take off your breasts. We can chop off your breasts and take your ovaries, but we will cover that. We will cover that, so you won't have to pay for that option. You will have to pay for the genetic testing, but[,] on the other hand, if we take off your breasts and ovaries, you won't have to pay for it.[']"

The court was unpersuaded. It seemed to the court that plaintiff was trying to make

- 9 -

Dunnington responsible for financial realities beyond his control. The court saw no evidence, from the depositions, that plaintiff chose genetic testing but Dunnington vetoed that choice because of her inability to pay; rather, it appeared that plaintiff herself declined genetic testing because she could not pay. Lack of money might have motivated her, but it did not motivate Dunnington. Therefore, the court granted paragraphs 4 and 5 of defendants' motion in limine.

D. The Striking of Testimony from Weber's Evidence Deposition

1. Objections on the Grounds of Irrelevancy and Violation of the Order in Limine

In a hearing on March 8, 2007, the trial court sustained the relevancy objections that defendants' attorney made on February 27, 2007, in Weber's evidence deposition. In her brief, plaintiff complains of the consequent striking of the following testimony from the deposition (we quote the page of the record that she cites):

"BY MS. de SAINT PHALLE:

Q. Doctor, the--I want you to assume that one of the reasons why Dr. Dunnington didn't send Sandra Downey for genetic counseling was because she could not pay for genetic testing. If, in fact, Dr. Dunnington did that, would that conduct fall within the standard of care of a reasonabl[y] careful surgeon at an academic medical center?

MR. HARLESS [(defendants' attorney)]: I object to that question because that's been the subject of a motion in limine[] and I believe there are no facts upon which she could base an opinion on that topic or on that opinion [sic].

MS. de SAINT PHALLE: Okay.

Q. Do you remember the question?

A. No.

Q. Okay. I will read it again.

MR. HARLESS: Just for the record, let me just show my objection now so I won't have to interrupt your question and answer again. Is that fair?

MS. de SAINT PHALLE: Sure, right.

BY MS. de SAINT PHALLE:

Q. Doctor, I want you to assume that one of the reasons why Dr. Dunnington didn't send Sandra Downey for genetic counseling was because Sandra could not--indicated that she could not pay for the genetic testing. If Dr. Dunnington did that, would that conduct fall within the standard of care of a reasonably careful surgeon practicing at an academic medical center?

MR. HARLESS: Show my objection.

A. I believe it would not.

Q. And could you tell me why?

MR. HARLESS: Same objection.

A. I think there are two answers. The first is that there's great value to genetic counseling[,] whether the genetic testing is actually performed or not. Many people

will see a genetic counselor and not ultimately have the testing for a variety of reasons.

I also believe that making medical decisions based on a physician['s] or surgeon's opinion on what might or might not be affordable to the patient is not the standard of care[,] either.

Q. All right. Let me give you another assumption. I want you to assume whether--assume that Dr. Dunnington told the patient that if she wanted to have the genetic testing, she would have to be able to pay the $2,000 for the test but, on the other hand, *** if she chose to have the bilateral prophylactic mastectomies, *** she would not have to pay for that procedure.

Do you have an opinion, to a reasonable degree of medical certainty, as to whether that advice conforms to the standard of care that would be--that would be made by a reasonably careful surgeon at an academic medical center?

MR. HARLESS: Let me tender an objection to the hypothetical question because it does not state material facts that are in evidence in this case, at least in the discovery depositions of this case, and it excludes important material facts and, therefore, is incomplete. I would also object because this has been the subject of a motion in limine and

has been ruled, at least at this point, to be inadmissible.

BY MS. de SAINT PHALLE:

Q. Go ahead.

A. I believe that would be far outside the standard of care and that it would actually be coercive and wrong to the patient.

Q. Why is that?

MR. HARLESS: Same objection.

A. Because this patient was very much afraid of getting cancer. She had very little money, and she came in asking about the prophylactic surgery. She would then have been told, ['Y]es, you can either have what you are asking for free[,] or you can pay $2,000 for a test to see if you need it.['] I just don't think that's a fair position to put a patient in. I don't think they could make a good decision under those circumstances.

Q. All right."

As the trial court explained to counsel, it was sustaining defendants' objections and striking the above-quoted text from Weber's evidence deposition because "it would [have been] conjecture on anyone's part to determine why it [was that Dunnington] didn't refer [plaintiff for genetic counseling]. He has said that he didn't refer her because she didn't want to go--she wanted to have the surgeries, I believe." Defendants' attorney added: "She chose not to have the genetic testing, and she chose to

- 13 -

have the surgery instead.  She chose among her options."  "Yeah," the court said in agreement.

In response, plaintiff's attorney pointed out the following portions of Dunnington's discovery deposition:

"Q. Well, given the fact that you knew [plaintiff] was on [p]ublic [a]id, you knew that she had limited funds by definition, correct?

A. That's correct.

Q. Have you had patients, other patients on [p]ublic [a]id[,] [who] have, at that period of time, obtained BRCA 1/BRCA 2 testing?

A. I can't give a definite answer, but I can't recall any that have.

* * *

Q. Would you agree that if Sandy didn't have the $2,000, *** the BRCA 1[/]BRCA [2] testing was not an option for her?

She didn't have the money, she couldn't get the test?

A. Correct.

* * *

Q. You don't have any firsthand knowledge[,] though[,] of the reason why, specific reason why she [did] not opt[] for it?

- 14 -

A. That's correct.

Q. And, in fact, if it was the cost, the money, you wouldn't have any reason to doubt that, would you?

A. No."

Dunnington further testified, in his deposition, that he never told plaintiff, one way or the other, whether she should have prophylactic mastectomies: "My role as a clinician is to say, ['H]ere are the options, here are the factors you should consider in the discussion with your physicians and your family, and you should make the decision." He merely told plaintiff that if she chose prophylactic mastectomies, he "believe[d] that would have been a reasonable choice." When explaining the options to her, he did not believe public aid would cover prophylactic mastectomies any more than it would cover genetic testing.

Plaintiff's attorney asked Dunnington in his deposition:

"Q. Well, why did you tell her[,] then--if you didn't tell her that you didn't think [p]ublic [a]id would cover the prophylactic mastectomies, why did you tell her that [p]ublic [a]id wouldn't cover the BRCA 1/BRCA 2 testing?

A. Very simple reason[:] because I knew the only way for her to get BRCA 1 testing was for her to pay out-of-pocket.

However, I was quite confident the hospital would cover the charges[] as well as the practice plan. We routinely treat patients who have no ability to pay if we believe it's a

medical necessity.

So[,] the operation could have been done without her ability to pay, but the BRCA testing could not have [been done].

Q. Well, the--don't you think it would be significant to a patient to know whether or not [p]ublic [a]id would cover the operation?

A. That's why, once Sandy made the decision, we began[--]again, as we always do[--]at least a request. This request was submitted by Doctor Zook's office[,] and we fully anticipated the answer would be, ['W]ill not cover,['] at which time we would have Sandra go to the practice plan and discuss payment and how it would have been dealt with.

And we were very surprised that they[--]essentially, in this case, again, for the first time that I can recall[--]agreed that it was medically necessary and elected to pay for the procedure."

Still unpersuaded, the trial court adhered to its ruling: insomuch as Weber opined, in her evidence deposition, that Dunnington violated the standard of care by denying genetic counseling to plaintiff on the ground that she could not pay for it, that opinion was irrelevant, and should be stricken, because its factual predicate lacked any basis in the evidence.

2. Objection on the Ground That the Answer Was Unresponsive to the Question

- 16 -

In Weber's evidence deposition, defendants' attorney asked Weber:

"Q. Doctor, isn't it true that even if Sandra Downey had undergone genetic counseling, you can't say that she would have had genetic testing, can you?

A. No, but I can say that if I think she had a bilateral prophylactic mastectomy[] in the absence of genetic testing, that would have been a mistake.

MR. HARLESS: I move to strike her answer as nonresponsive.

Q. Isn't it true, Dr. Weber, that even if Sandra Downey had undergone genetic counseling, you can't say that she would have had genetic testing, can you?

A. No."

In the hearing of March 8, 2007, defendants' attorney moved to strike the first question and answer, quoted above, on the ground that the answer was unresponsive to the question (the same objection motion he had made in the evidence deposition itself). Plaintiff's attorney opposed the motion for two reasons: the answer was responsive to the question, and, alternatively, it was "inappropriate *** to ask an outside witness what Sandra Downey would have done," for the outside witness's opinion in that respect would have been irrelevant and speculative. Over plaintiff's objection, the trial court granted defendants' motion to strike.

E. Defendants' Motion for Partial Summary Judgment

On March 5, 2007, defendants filed a motion for summary judgment, in

- 17 -

which they sought a summary determination in their favor on paragraphs 23(c) and (d) of counts I and II of the second amended complaint. See 735 ILCS 5/2-1005(d) (West 2006). The motion stated as follows:

"1. Judgment should be entered in favor of [d]efendants because there is no genuine issue as to any material fact that Dr. Dunnington did not allow considerations of [p]laintiff's ability to pay for genetic testing to affect the manner in which he presented treatment options to the [p]laintiff.

2. Judgment should also be entered in favor of [d]efendants because there is no genuine issue as to any material fact that the [d]efendants did not have a duty to inform the [p]laintiff that grants were available to obtain genetic testing."

The trial court granted the motion for partial summary judgment on March 8, 2007.

F. Amendment of the Second Amended Complaint

On March 13, 2007, plaintiff filed a motion to amend the second amended complaint "to replace the term 'genetic testing' with the term 'genetic counseling' in paragraph 23(b) of [c]ount I ***, to eliminate subparagraphs (c) and (d) from the same paragraph [(i.e., the two subparagraphs on which the trial court had entered partial summary judgment)], [and] to conform the pleadings to the pretrial rulings made by the court and the proof expected in this case." Simultaneously, plaintiff filed the proposed amendment, which changed paragraph 23 to read as follows:

- 18 -

"23. *** [A]t the same time and place mentioned in the preceding paragraphs, the [d]efendant, Gary Dunnington, M.D., notwithstanding his duty to act as a reasonably careful physician, committed one or more of the [following] negligent acts or omissions:

(a) failed to properly investigate [p]laintiff's family history of cancer[,]

(b) failed to refer [p]laintiff for genetic counseling[,] [and]

(c) performed prophylactic mastectomies on the [p]laintiff without sufficient medical indications."

On March 15, 2007, defendants filed an answer to the amendment of the second amended complaint, in which they denied the allegations in modified paragraph 23.

### G. The Testimony at Trial

#### 1. Plaintiff

In 1967, when plaintiff was five years old, her mother had surgery for breast cancer. At age 10, plaintiff found some "balloon things" in her mother's dresser drawer, and sometime later, her mother explained to her their purpose: she had undergone mastectomies to prevent a recurrence of cancer. Thus, from an early age, plaintiff was aware of breast cancer in her family.

In 1996, when plaintiff was 34 years old, she discovered a lump in her right

breast.  A mammogram revealed an abnormality, but a biopsy revealed the lump to be benign.  At this very time, her grandmother was undergoing radiation therapy for breast cancer.

In 1998, plaintiff found another lump in her breast, and the lump kept getting bigger and was causing a "burning, fiery feeling."  It did not show up in a mammogram, and an ultrasound revealed no malignancy.  The diagnosis was fibrocystic changes in the breasts.

Plaintiff continued doing self-examinations and found another lump, which likewise kept getting bigger but was invisible to mammogram and ultrasound.  Her  obstetrician/gynecologist in Jacksonville, Guy Audet, referred her to a local surgeon, James L. Green, who requested that she bring with her, to her appointment, a written history of the occurrence of cancer in her family.  Plaintiff's mother, Betty Hart, wrote the history in longhand on a single sheet of paper and brought it with her when she accompanied plaintiff to Green's office on January 19, 2000.  The document lists plaintiff's relatives on her mother's side of the family, along with the various cancers from which they suffered over the past half-century.  Under the heading "<u>Mother</u> <u>Betty</u> <u>Hart</u>," the document reads:  "Breast Cancer 1967" and "Ovarian Cancer 1979."  Green told plaintiff that because of her family history of breast cancer, she was "considerably at high risk in the general population."  He suggested that she consider either bilateral prophylactic mastectomies or prophylactic Tamoxifen.  He warned her that the drug Tamoxifen was "experimental and that the side effects were risky."  At this point, plaintiff was "thinking about whether prophylactic mastectomies would be a reasonable option."  She read an article stating:  "In women with a high risk of breast cancer on the

basis of family history, prophylactic mastectomy can significantly reduce the incidence of breast cancer."

Green referred plaintiff to another surgeon, Elvin Zook of the Institute of Plastic and Reconstructive Surgery at SIU, for a biopsy. She went to see Zook on February 14, 2000, and her mother came along, bringing the handwritten family history. Plaintiff's mother was present and listened as plaintiff recited the family history to medical personnel. Zook's resident wrote down that plaintiff's mother "developed bilateral breast cancer and had bilateral mastectomies[] at age 27." Zook advised plaintiff that before they made a decision on reconstructive surgery, she should see a breast surgeon to determine whether she was even a candidate for bilateral prophylactic mastectomies. He referred her to Dunnington.

Before seeing Dunnington, plaintiff talked with her mother, and, together, they weighed the options. Her mother urged her to "keep an open mind and to consider mastectomy as an option."

When plaintiff went to see Dunnington on February 16, 2000, she brought her mammogram films as well as the family history her mother had written out. Again, her mother accompanied her to the appointment. In Dunnington's office, plaintiff filled out a form entitled "History." The form said: "Please answer all questions to the best of your knowledge. The information provided by you will be used by your doctor in his/her decisions regarding your care." Plaintiff wrote on the form that she had been having breast pain and a "yellow white discharge" from the nipples and that the lump on her right breast had been growing bigger and increasingly painful. She answered yes to the question of whether she had "a family history of breast cancer" and, in explanation,

wrote: "Mother [b]oth [b]reast[s] at 26" and "Grandmother [at] 82." Although her mother was present at the appointment, plaintiff never asked her if her cancer had, in fact, been in both breasts. As it turned out, plaintiff was confused: her mother had cancer in only one breast, although she underwent a bilateral mastectomy.

At trial, defendants' attorney asked plaintiff what she had said in her discovery deposition about the handwritten notation, in the "History" form, "Mother [b]oth [b]reast[s] at 26." Plaintiff's attorney objected on the ground that the proposed impeachment concerned a collateral matter; the trial court overruled the objection. Plaintiff answered that in her deposition, she denied writing those words and professed to be ignorant of who had written them. She admitted her deposition testimony was incorrect in that respect and that she herself was the one who had written, "Mother [b]oth [b]reast[s] at 26." Defendants' attorney asked her if she had told a falsehood in her deposition. Plaintiff answered: "I felt after 100 pages of deposition, I was scared, and I was intimidated by you." Defendants' attorney then asked her if she was aware that defendants had hired a handwriting expert from St. Louis, William Storer, who was prepared to testify that the handwriting in question was plaintiff's. Defendants' attorney showed plaintiff the notice of this witness's expected appearance and testimony, which he had mailed to plaintiff's attorney several months ago. Plaintiff answered she was unaware of this witness.

On February 16, 2000, after plaintiff completed the "History" form, Dunnington reviewed the information therein with her and her mother, including the representation that her mother had cancer in both breasts at age 26. At the time, Dunnington remarked to plaintiff that "it was a serious family history." This remark

struck fear into plaintiff, considering that Dunnington must have "seen thousands of women every year." Plaintiff's mother told Dunnington that she had a history of ovarian cancer and that plaintiff's sister likewise developed ovarian cancer at age 26. Plaintiff testified she was unclear, at that time, about her sister's medical history--she knew her sister had undergone a hysterectomy for cancer--and, for that matter, she was unclear about the difference between ovarian, uterine, and cervical cancer. Only later did plaintiff learn that her mother and sister had cervical cancer in situ, not ovarian cancer, and that cervical cancer in the family did not increase her own risk for breast cancer.

Having discussed the family history with plaintiff and her mother, Dunnington performed a physical examination of plaintiff, including the areas in both breasts where she felt lumps. He found a mass in another area. He also looked at the mammograms and collected tissue for a biopsy.

After the physical examination, Dunnington discussed with plaintiff three options: (1) Tamoxifen, (2) genetic testing, and (3) bilateral prophylactic mastectomies. Like Green, he warned plaintiff that Tamoxifen had troublesome side effects, including blood clots and hypertension. Plaintiff did not think she could afford Tamoxifen, anyway. As for the genetic test, Dunnington told her it would "assist [her] in making [her] decisions" but "there was a cost associated with that test" and public aid would not cover the cost. Although Dunnington did not discourage plaintiff from genetic testing, he did not push her toward it, either--and he never asked plaintiff's mother if she was willing to undergo genetic testing. Unlike plaintiff, her mother was employed at the time and had insurance, which, according to plaintiff's testimony, would have covered the genetic test. Plaintiff "would have loved to have had this genetic testing," but she

lacked the means of purchasing it.  Therefore, she considered option No. 3.

Plaintiff testified:

"A. [Dunnington] talked to me about the possibility of prophylactic mastectomy.

Q. Okay, tell me, what did he say about the prophylactic mastectomies?

A. *** [H]e explained to me that if they remove[d] the tissue[,] *** the outcome would be that I would not get cancer [or] breast cancer[;] it would eliminate my risk.

Q. Did he tell you whether or not you'd have to pay for those?

A. *** I believe he said that I wouldn't have to pay for them.

Q. When Dr. Dunnington mentioned the mastectomies, what was your reaction?

A. Well, what any woman's reaction would be.  You're scared.  *** I thought that my risk was so high that I should have them.

Q. Well, why did you feel that your risk was so high that you should have them?

A. Because *** the family history that my mother had written out[] put us [at] a high risk, and I thought that within the next couple of years[,] I would get cancer[] and I'd have

to go through mastectomies, chemotherapy[,] or possibly death.

                                * * *

Q. What made you decide for the prophylactic mastectomies?

A. Well, I didn't want to get cancer[,] for one [thing], and the other two alternatives I couldn't afford.

Q. *** [Y]ou mentioned you thought *** you were going to get cancer in the next couple of years[;] how likely did you think you were going to get cancer in the next couple of years?

A. Very likely.

Q. All right.  If you had known that your risk of getting cancer over a lifetime was 20[%] or 25%, would you have agreed to get bilateral mastectomies?

A. No.

                                * * *

Q. Did Dr. Dunnington tell you that your life[]time risk of getting bilateral mastectomies [sic] was 20[%] or 25[%]?

A. No.

Q. Did Dunnington give you any specific percentage of what your risk factors were?

A. I believe he was talking in ranges, but I don't specifically remember."

When leaving Dunnington's office on February 16, 2000, plaintiff had no unanswered questions. Later, Dunnington's office called and told her the biopsy had come back and the lump in her breast was benign. Plaintiff decided she wanted to be safe and that prophylactic mastectomies were the best option for her.

Plaintiff then consulted a gynecologist, Marta Crispins, who "evaluated [her] initially for consideration of whether [she] had ovarian cancer" (we quote from Crispins's report). Plaintiff complained to Crispins of "a several[-]year history of left lower quadrant cramping and bleeding." Crispins ordered some imaging studies of plaintiff's abdomen, which revealed that plaintiff had a tumor. Having previously undergone a tubal ligation, plaintiff chose to proceed with a hysterectomy and removal of her ovaries at the same time as the bilateral mastectomy and breast reconstructions. She underwent all these surgeries on March 17, 2000.

## 2. Plaintiff's Mother and Sister

Plaintiff's mother, Betty Hart, and plaintiff's sister, Kim Williamson, both testified they would have given Dunnington an authorization for the release of their medical records if he had asked them for one. The sister testified she had developed pre-cancerous cells and undergone a hysterectomy but that she never had ovarian cancer or breast cancer. The mother testified that sometime in the 1980s, she developed cervical cancer and underwent a hysterectomy. She further testified her breast cancer was in the right breast alone although she had "problems" in the left breast. She did not know whether she had told plaintiff she had right-sided breast cancer as opposed to bilateral

breast cancer, for she "was a private person[] and *** took baths with [her] doors locked and stuff. [She] kn[e]w it wasn't anything to be ashamed of, but [she] was."

### 3. Dunnington

Over plaintiff's relevancy objection, the trial court allowed Dunnington to testify that he grew up in a small town, his father was a minister, and his mother was a "stay-at-home mom." He further testified he had four children, and he described their educational accomplishments. As for Dunnington himself, he was 53 years old and a surgeon at SIU School of Medicine. He had been practicing in Springfield for 10 years. He was a professor of surgery and the chairman of the department of surgery. He also was director of the Breast Center at SIU. Most of his practice was devoted to breast surgery. He also conducted research and had published articles and books.

Dunnington explained that just because an article had been published in a medical journal, it did not necessarily follow that the article set forth the standard of care. Although Dunnington had "a lot of respect" for Weber, who, like him, was a published author, she was an oncologist rather than a surgeon, and this difference in their specialties caused her and Dunnington to have different views of the standard of care. Often, an oncologist did not see a patient until after the diagnosis of cancer was made, whereas a surgeon saw patients "at all stages of activity." "[W]hen other specialists see patients with breast lumps, the first thing they do is find a surgeon, and it's [the surgeon's] responsibility to see those patients and put all the information together and make a decision." The standard of care was a consensus that had evolved among surgeons as to the most appropriate care. Through his education, training, and experience as a surgeon, Dunnington knew the standard of care for surgeons.

- 27 -

When plaintiff came into the Breast Center on February 16, 2000, she filled out a "History" form, and Dunnington discussed with her and her mother the notation "Mother [b]oth [b]reast[s] at 26." Plaintiff appeared to him, at the time, to be a reliable source of information. Defendants' attorney asked Dunnington:

"Q. What did [plaintiff and her mother] tell you about her family history?

A. Well, that her mother developed cancer in both breasts. [The] information I received was that it was at the same time. You could have a cancer at one age and three or four years later[,] a subsequent cancer, but [they] communicated to me [that] at age 26, both breasts were involved with cancer[,] requiring a bilateral radical mastectomy[] and chemotherapy--gold treatment would have been chemotherapy[--]and she communicated to me the other aspects about ovarian cancer, the mother's cancer, et cetera.

Q. Doctor Weber testified that whether it's one breast or two breasts is really of little significance. Do you agree?

A. No, I do not agree with that.

Q. Can you tell us why you disagree?

A. Well, for one [thing], as you look at indications for genetic testing, for example, often they will be very specific that not only first-degree relative with breast cancer, but

- 28 -

often on that list, as well as bilateral cancer, and think about what we said earlier.  In order to get a breast cancer in one breast at a young age, we have said it requires two hits to get two breast cancers, *** so now we are talking about an even lesser chance of that occurring by age 26, just by chance environment, too much estrogen, et cetera, but it becomes less likely if you have both breasts involved in cancer at a young age, becomes more likely there's a genetic issue there."

In his consultation report, Dunnington wrote:  "At this point, the patient seems very intent on proceeding with bilateral prophylactic mastectomies."  When plaintiff came to see him on February 16, 2000, "it was clear she had spent a lot of time thinking about this.  There had been research done with her family.  She [had] talked to Dr. Green.  She had talked to Dr. Zook.  She [had] talked to her mother.  She [had] talked to her sister.  So there was a fair decisiveness about it, that she was very, very interested and desiring to proceed with prophylactic mastectomy."  In fact, the moment Dunnington walked into the examination room, he "looked [at] the reason they [were] there, and it [read], 'Interested in prophylactic mastectomy'"; he knew that "[his] goal[,] right from the beginning[,] [was] to give them good solid reasons for not wanting to proceed, and [he] realized[,] after a bit into this encounter[,] [that] it was going to be a challenge."

Dunnington agreed that in some cases, ordering medical records was necessary--but he insisted this was not such a case.  "I had the evidence that the mother had a premenopausal breast cancer.  That was the trigger for genetic testing to be

- 29 -

offered and encouraged[;] that's the only trigger that was necessary.  Finding out that she really didn't have ovarian cancer wouldn't have changed the need for genetic testing. It wouldn't have changed the benefit of prophylactic mastectomy."

Given the family medical history as described to him by plaintiff and her mother on February 16, 2000, Dunnington opined that plaintiff had as high as an 80% chance of developing breast cancer.  "[T]hat's the high end of the range," he testified; greater specificity was impossible without genetic testing.  Because he had so many patients, he could not specifically remember what he had told plaintiff, but he would have followed his established procedure, which was to inform the patient of a rather wide range of risk.  He testified:  "I would have explained it just as I have already, that if all we know is family history, your risk of cancer would be a low of 15[%] but as high as 30%, but if you have genetic testing and you carry the gene, it could be as high as 80%."

Plaintiff's attorney asked Dunnington:

"Q. Now, you would agree that according to
[plaintiff's] actual family history, *** her risk, given the fact
that her mother had breast cancer at an early age[,] age 28[,]
was only 15%, correct?

A. No, that's absolutely incorrect, because the way we
often do these cases--

Q. Doctor, please."

Plaintiff's attorney then impeached him with the testimony he had given in his discovery deposition.  She read him the following question and answer from his deposition:

"Q. 'Question:  You mentioned what the risk of a

- 30 -

woman obtaining breast cancer who had either a mother or a sister with premenopausal breast cancer. Answer: It would be a range. If it's just first-degree relative postmenopausal, it's probably three times. With premenopausal[,] it's between--somewhere between three and five times increased risk, so that would mean maybe 15% maximum, correct--15% maximum[?]' And you answered, 'Correct.'

Do you recall those questions and those answers[?] If you want to see it, I can show it to you.

A. Yeah, I stated--I've stated earlier it would be a range, and you're picking the low end of that range.

* * *

Q. Let me ask it again. Doctor, do you recall that question, 'So that would be between three and five times increased risk, so that would mean maybe 15% maximum.' And you answered, 'Correct?'

A. I did."

Dunnington wrote a chapter in a medical textbook, wherein he stated: "'The first major risk factor [for breast cancer] is family history.'" He also wrote that "'[a] strong family history in association with a young age diagnosis raises the possibility of BRCA 1[] (breast cancer gene 1, also associated with ovarian cancer).'" He admitted, at trial, that a woman with a history of breast cancer and ovarian cancer was 19 times more likely to carry this breast-cancer gene than women with a history of breast cancer

- 31 -

alone. Cervical cancer, however, had not been shown to be linked to the breast cancer gene. He admitted that women of limited education might not know the difference between ovarian cancer and cervical cancer, and he had heard of a study finding that patients were only 60% accurate in reporting histories of ovarian cancer. He acknowledged that medical records were a more accurate source than the patient's oral account and that before taking a radical step such as cutting off a woman's breasts, it was necessary to consult "the appropriate medical records." He agreed that the conjunction of cancers in plaintiff's family history, as represented to him, was extremely rare (not only premenopausal cancer in both breasts but two women surviving ovarian cancer) and that if presented with a medical history so exceptional, he would want to confirm it--but "[o]nly if it [made] a difference in what [he was] going to discuss with the patient or offer to her as options for therapy."

In his physical examination of plaintiff on February 16, 2000, Dunnington found "dense fibrocystic material" in her breasts; this was a normal byproduct of menstrual processes. Lumpy breasts did not increase the risk of cancer, but the density of the breasts could increase the likelihood that if cancer did develop, it would be missed in a mammography. The risk of missing cancer in a mammography went down considerably, however, after the patient reached age 50.

Although Dunnington never told plaintiff that hers was "the worst family history he had ever seen" (he knew better than to scare a patient that way), he might have told a colleague something to that effect. He wrote in plaintiff's medical records:

"I have explained to the patient that she represents a very complicated history and family history and that she is clearly

- 32 -

at significant risk for developing breast cancer. We have talked about the possibility of genetic testing because of her high incidence of ovarian and breast cancer in the family, but because she has recently been declared eligible for Medicaid, this would not be covered by that medical coverage. I have explained that her risk factors are so significant[] that she would probably be a good candidate for consideration of bilateral prophylactic total mastectomies ***."

In his 20 years as a breast surgeon, he had treated "only five patients [who] felt very strongly that [bilateral prophylactic mastectomies were] the best option for them."

Genetic testing gives the patient a more definite idea of her risk before she chooses prophylactic mastectomies. It is a blood test performed by a corporation in Utah, Myriad Genetics, Inc., and the test, if it had been given, would have been performed on a blood sample from plaintiff's mother, because she was the one who had contracted breast cancer. Only if the mother tested positive for the breast cancer gene would plaintiff then be tested. If a woman tested positive for the BRCA 1 gene, her chances of developing breast cancer were 80%.

Dunnington admitted that SIU had "genetic counselors as part of the services that it provide[d]" and that "if the patient didn't have the money for genetic counseling, as opposed to genetic testing, [SIU's] practice plan would cover it." Although Dunnington agreed it was "the function of a genetic counselor to take a careful family history," he believed "it would be far outside the standard of care for genetic counselors to get medical records." Plaintiff's attorney then showed the jury an SIU

- 33 -

videotape that Dunnington himself had commissioned, in which a genetics counselor, Lisa Rimer, stated as follows:

"We begin with a three[-]generation family history[,] ***
documenting all the different types of cancer within the
family[,] and[,] hopefully[,] we can obtain records to actually
document those specific types of cancer.  After we get the
family history information, you can make a risk assessment
for that woman."

Dunnington testified that instead of sending plaintiff to a genetic counselor, he "did the genetic counsel[ing] for her."  In his opinion, a surgeon was best qualified to do genetic counseling and risk assessment.  If plaintiff had "accepted genetic testing," he would have referred her to a genetic counselor, who then would have explained to plaintiff, among other matters, the potential implications for her insurability if the genetic test showed she carried the breast cancer gene.

Once plaintiff told Dunnington she wished to undergo bilateral prophylactic mastectomies, he referred her to a gynecologist, Crispins, for advice on whether she also should undergo prophylactic removal of her ovaries.  On March 1, 2000, Crispins wrote Dunnington as follows:

"Thank you for sending Ms. Sandra Downey in consultation.
As you will recall, she is a 37-year-old white female with a
family history suggestive of hereditary breast [and] ovarian
cancer family syndrome, and[,] certainly, prophylactic
oophorectomy would be quite reason[able] in this case.  I

- 34 -

have counseled this patient regarding the risks and benefits

of a prophylactic oophorectomy[,] and she does desire to

proceed."

Dunnington agreed that unless he had considered plaintiff to be a candidate for

prophylactic mastectomies, he would not have referred her to Crispins.

In his operative report, Dunnington described plaintiff as "a

38[-]year[-]old female with a very strong history for ovarian and breast cancer."  This

was the only indication for bilateral prophylactic mastectomy that he stated in the

report.  Another factor that led him to consider this procedure was her fear of cancer.

Dunnington maintained that if he had known that plaintiff's mother had only right-

sided breast cancer as opposed to bilateral breast cancer and that neither the mother nor

the sister had ovarian cancer, it still would have been "reasonable" to discuss

prophylactic mastectomies, considering that the mother had premenopausal breast

cancer, "which[,] again[,] significantly raise[d] her risk."  He admitted, however, that

"[t]he case [for mastectomies] would not have been as overwhelming."  Apart from her

mother's breast cancer, plaintiff had other risk factors--the density of her breasts and

their fibrocystic condition, multiple breast biopsies (all of them normal), breast pain,

and spontaneous nipple discharge--but these were not as important as the family history

plaintiff represented herself to have.

After Dunnington testified to these risk factors, plaintiff's attorney showed

him plaintiff's exhibit No. 24, a newsletter published in 1993 by the Society of Surgical

Oncologists (SSO), of which he was a member, and containing an article entitled, "SSO

Develops Position Statement on Prophylactic Mastectomies."  The article quoted the

position statement. Dunnington agreed with SSO's position statement as to what the indications were for bilateral prophylactic mastectomies. He agreed that "'only rarely is this radical extirpative approach indicated.'" He agreed that, given plaintiff's actual family history, she met none of the criteria for this procedure as set forth in the position statement.

### 4. Weber

Plaintiff's expert, Weber, was board-certified in internal medicine and medical oncology. She was a professor of genetics at the University of Pennsylvania and the director of its breast center. She had published articles on prophylactic mastectomies and breast-cancer risk-assessment in the New England Journal of Medicine and in surgical journals. She had been an invited speaker at SSO.

Weber testified that before performing prophylactic mastectomies, a reasonably careful surgeon should not only obtain but verify the patient's family history and the surgeon then should use a risk-assessment tool to determine how likely it was that the patient would develop breast cancer. The incidence of ovarian cancer in the family greatly increased the risk that the patient carried a breast cancer gene, BRCA 1 or 2. If a woman carried that gene, she had a 60% to 80% chance of getting breast cancer. That woman's daughter in turn would have a 40% chance of carrying the breast cancer gene.

In Weber's opinion, Dunnington deviated from the standard of care in two ways: (1) failing to send plaintiff to a genetic counselor and (2) failing to verify plaintiff's family history. According to Weber, Dunnington should have sent plaintiff to a genetic counselor regardless of whether plaintiff intended to undergo genetic testing.

Genetic counselors were specially trained to compile an accurate family history, document it with medical records, and explain to the patient what her risk was. As was well known from published studies, patients tended to err in their accounts of family medical history, especially with respect to gynecologic cancers. There was a vast difference between cervical cancer and ovarian cancer: cervical cancer, unlike ovarian cancer, did not increase the risk for breast cancer. Further, none of the risk assessment tools gave more significance to bilateral breast cancer than to one-sided breast cancer; "the primary determinant of breast cancer risk in families [was] the age of diagnosis of the first breast cancer[,] no matter how many subsequent breast cancers that person [might] have had." Given plaintiff's actual family history, Weber opined that she had only a 21% chance of developing breast cancer by age 80.

In Weber's opinion, plaintiff was not a candidate for prophylactic mastectomies, for her actual risk of getting breast cancer was only 20% as compared to the average risk of 12%. Weber did not regard the fear of cancer as a legitimate reason for prophylactic mastectomies unless the patient had an 80% lifetime risk of developing breast cancer. Had plaintiff gone to a genetic counselor, the inaccuracy of her family history would have been discovered, and she would have avoided the unnecessary surgery. The mother would have been tested for the breast cancer gene, and given her actual medical history, her chances of testing positive would have been only 15%.

### 5. Fines

Defendants' expert, Richard Fines, was a board-certified surgeon in private practice in Marietta, Georgia. He had lectured on breast disease and breast cancer treatment. He also was a past president and board member of the American Society of

Breast Surgeons, "an organization of about a little over 2[,]000 surgeons who [were] focused on the care of patients with breast disease."

In Fines's opinion, Dunnington complied with the standard of care in his treatment of plaintiff. Fines testified: "[T]aking a history is actually something that we learn in medical school, *** and the two key things that come about from that skill are knowing *** the appropriate questions to ask, and then the second is, [I]s your patient a reliable source[?]" As for asking the right questions, Dunnington was, in Fines's opinion, "very methodical. He had a questionnaire filled out by the patient," and "he actually went through the questionnaire in pretty much detail with the patient and even made notes on the questionnaire[,] indicating that he was confirming the answers to those questions." The family member whose medical history was being discussed was even present, and "if there would have been anything that was being said that was incorrect, [Fines] would [have] expect[ed] [that] the person whose history was [under discussion would] be able to know and state whether or not that was correct or incorrect." To Fines, it was reasonable of Dunnington to rely on the history that plaintiff and her mother had given. Fines "didn't see any evidence or detect any evidence of a poor historian." Defendants' attorney asked Fines:

"Q. Dr. Fines, in your work with surgeons across the country, do surgeons routinely obtain records not of the patients themselves, but the patient's family members[,] to confirm a verbal history?

A. No, they do not."

Fines deemed it unnecessary to confirm that plaintiff's mother had ovarian

- 38 -

cancer. He testified:

"A. The most important issue is that [plaintiff] had a

mother, first-degree relative, with breast cancer before the

age of 30, and that[,] in and of itself[,] increases her risk.

Even if she is not a genetic carrier, her risk is in the 20[%] to

30% range, which is [3] to [5] times what the risk would be

for a woman with no risk factors at all, and so discussing

chemo prevention, for Tamoxifen reducing her risks,

discussing lifestyle changes[,] and discussing the possibility

of prophylactic surgery, if the patient comes in with that on

her mind in requesting that, I think that would be

appropriate."

Further, given the family history that plaintiff and her mother represented to

Dunnington, it was possible that plaintiff had inherited the breast cancer gene from her

mother, in which case plaintiff would have had an 80% chance of developing breast

cancer within her lifetime.

Fines testified that genetic counselors were not the only ones who could do

genetic counseling; physicians also could do genetic counseling. If a physician did the

genetic counseling, it was unnecessary to send the patient to a genetic counselor.

According to Fines, there was no "numerical cutoff" for prophylactic

mastectomy. "It's very hard[,] when you are taking care of patients[,] to apply a specific

number. You know, a patient may have a 15% risk of breast cancer, but she may have

true levels of anxiety that are affecting her quality of life, [or she might have] very

complicated breasts to follow."  Fines disagreed with Weber that 20% was too low a risk to justify bilateral prophylactic mastectomies.

On cross-examination, Fines testified he was a solo practitioner.  He had never worked in an academic medical center.  He had never written any articles on prophylactic mastectomies or risk assessment of patients with breast cancer.  From his general reading, he had found no articles pertinent to this case.  In formulating his opinion on the standard of care, he relied in part on his own practice.  If a patient wanted to know her risk of getting cancer, he "sometimes" sent her for genetic counseling, as a reasonably careful surgeon would do.  Articles in medical journals stated that "genetic counseling [was] appropriate prior to doing prophylactic mastectomies."  Fines admitted that before doing a lumpectomy, he would not rely on the patient to tell him which breast had the lump.

Fines agreed that when writing an operative report, a surgeon should state the reasons for the surgery and the reasons should be accurate.  Dunnington's operative report stated he performed the prophylactic mastectomies on plaintiff because of her strong family history of breast and ovarian cancer.  Fines agreed that "many women [were] sometimes confused about gynecologic cancers," especially if they had the cancer 20 years ago, in which case "they [might] not remember."  Thus, "it would be important to get the medical records to check out the accuracy of the diagnosis"--"[i]f it was going to make a difference."  Plaintiff's attorney then asked Fines:

"Q. And[,] in fact, according to what Dr. Dunnington
wrote at the time in his operative report, it did make a
difference because of the fact that he said his indication for

doing the surgery was breast/ovarian cancer, isn't that true?

A. That's what he wrote in the indications on his operative report, yes."

Fines acknowledged there were clues, in Dunnington's own records, that plaintiff's mother was not an accurate historian, for in the family history that she wrote in preparation for the appointment with Green, she said that plaintiff's sister had "a few cancer cells" (more precisely, the document says, "[F]ound some cancer cells"), whereas, on the basis of his interview of plaintiff and her mother, Dunnington wrote on the "History" form that plaintiff's sister had ovarian cancer.

Plaintiff's attorney asked Fines:

"Q. Now, Doctor, isn't it true that you would have a difficult time saying that a patient who had a mother who had breast cancer on her right side at age 28 would be a candidate for prophylactic mastectomies?

* * *

A. Yeah, it depends on a lot of factors. It depends on, you know, the level of anxiety of the patient, what she had gone through, *** how many breast biopsies she had had, [and] how often she has been alarmed by mammograms and breast lumps."

Plaintiff's attorney showed Fines plaintiff's exhibit No. 24, SSO's position statement from 1993. The position statement said: "'Individuals with nonproliferative disease of the breast (fibrocystic disease) should not be candidates for mastectomy when

tissue biopsies have been reviewed and confirmed by qualified pathologists.'" Fines agreed with that statement, but he added that since 1993, breast biopsies had become a risk factor for breast cancer. To prove that the standard of care had not changed in that respect since 1993, plaintiff's attorney showed Fines plaintiff's exhibit No. 25, the 2001 position statement of SSO, which said the same thing about fibrocystic disease as in 1993. Defendants' attorney objected to plaintiff's exhibit No. 25 on the ground that it was published after Dunnington treated plaintiff. The trial court overruled the objection but instructed the jury that plaintiff's exhibit No. 25 was admissible only for impeachment, not as substantive evidence. Like Dunnington, Fines admitted that plaintiff met none of the indications for bilateral prophylactic mastectomy as set forth in plaintiff's exhibit No. 24.

Fines further admitted that according to the "Claus tables" published by Weber in February 2000 in the New England Journal of Medicine, the chances of plaintiff coming down with breast cancer by age 49 were 6%; by age 69, 11%; and by age 79, 21%. "I don't use the Claus model," he said. The other standard model for the assessment of risk, the Gail Model, "underestimate[d] risk," in his opinion. He was unable to say whether plaintiff would have chosen prophylactic mastectomies if she had been told that her risk of getting breast cancer by age 49 was only 6%. He agreed, however, that most women would choose to retain their breasts and endure the 6% risk.

At the conclusion of the evidence, the jury returned a general verdict in defendants' favor. The trial court subsequently denied plaintiff's motion for a new trial.

## II. ANALYSIS

### A. Refusing To Send Plaintiff's Exhibit No. 24 to the Jury Room

Plaintiff's exhibit No. 24 is the newsletter of SSO published in 1993 and containing the article entitled, "SSO Develops Position Statement on Prophylactic Mastectomies." Plaintiff claims "[t]he trial court erred in not admitting [this] [e]xhibit *** into evidence." On the authority of Ohligschlager v. Proctor Community Hospital, 55 Ill. 2d 411, 417-18, 303 N.E.2d 392, 396 (1973), Wojcik v. City of Chicago, 299 Ill. App. 3d 964, 977-78, 702 N.E.2d 303, 313 (1998), and other cases, plaintiff argues that evidence of professional standards is substantively admissible at trial. She notes that under Illinois Pattern Jury Instructions, Civil, No. 105.01, the standard of care can be established not only by "opinion testimony from qualified witnesses" but also by "evidence of professional standards." Illinois Pattern Jury Instructions, Civil, No. 105.01 (2006) (IPI Civil (2006) No. 105.01).

The parties disagree on whether plaintiff's exhibit No. 24 contains any evidence of professional standards. Dunnington testified the exhibit was not a peer-reviewed publication and that SSO prepared it for insurance companies rather than for physicians. Fines denied that the exhibit described the standard of care.

In plaintiff's view, plaintiff's exhibit No. 24 does indeed contain the professional standards for recommending prophylactic mastectomies. The article begins: "At the request of CHAMPUS, [i.e., the Civilian Health and Medical Program of the Uniformed Services,] [SSO] developed a position statement on prophylactic mastectomies to guide insurance programs in determining coverage and help patients obtain reimbursement. The following position *** was approved by the SSO Standards of Care Committee and forwarded to CHAMPUS through the American College of Surgeons." Then, under the subheading "SSO Position on Prophylactic Mastectomy,"

- 43 -

the article lists the "indications" for bilateral prophylactic mastectomies in patients with no diagnosis of cancer.

CHAMPUS is a subdivision of the Department of Defense, and it administers the Dependent's Medical Care Act (10 U.S.C. §§1071 through 1106 (2000)), a federally subsidized health care program for dependents of active-duty and retired members of the United States armed forces. CHAMPUS provides eligible beneficiaries "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. §199.4(a)(1)(I) (2007). It excludes coverage for services and supplies that are not "medically necessary." 32 C.F.R. §199.4(g)(15) (2007). In determining which services and supplies are medically necessary, CHAMPUS consults (among other sources) "[n]ational medical policy organization positions" and "[n]ational professional medical associations" (Smith v. Office of Civilian Health & Medical Program of the Uniformed Services, 97 F.3d 950, 960 n.13 (7th Cir. 1996))--thus CHAMPUS's request to SSO for a position statement on prophylactic mastectomies. Plaintiff infers that the position statement in plaintiff's exhibit No. 24 sets forth widely accepted professional standards for determining when prophylactic mastectomies are medically necessary, because the very reason for CHAMPUS's request was to ascertain, for purposes of coverage, what those standards were.

Defendant argues that "[t]he trial court properly refused admission of [p]laintiff's [e]xhibit [No.] 24 on the ground that it constitute[d] inadmissible hearsay. In [so] ruling, the court noted that two medical witnesses had testified that it was not a standard and was instead a guideline used for insurance purposes [citation to record]."

We do not see how the testimony of Dunnington and Fines negates the

existence of professional standards in plaintiff's exhibit No. 24. Just because the position statement was designed as a reference for insurance companies rather than for physicians, it does not logically follow that the position statement lacks evidence of professional standards. SSO surely understood that the position statement would be useful to CHAMPUS only if it were a statement of professional standards in the sense of what were the indications for prophylactic mastectomy. Fines testified that plaintiff's exhibit No. 24 "doesn't set [the] standard of care." But the question is not whether the exhibit sets the standard of care in the sense of specifying everything a physician should do or consider before recommending bilateral prophylactic mastectomies; the question is whether the exhibit contains evidence of professional standards which, in turn, would be relevant to determining the standard of care. See IPI Civil (2006) No. 105.01. To deny that plaintiff's exhibit No. 24 contains any evidence of professional standards almost seems tantamount to suggesting that SSO misled CHAMPUS. The whole idea of listing the indications for bilateral prophylactic mastectomies was to enable CHAMPUS to ascertain whether bilateral prophylactic mastectomies were medically necessary (32 C.F.R. §199.4(g)(15) (2007)). The corollary would seem to be that absent the listed indications, bilateral prophylactic mastectomies were not medically necessary (in which case CHAMPUS would deny coverage).

In any event, the parties are arguing over whether the trial court erred in excluding plaintiff's exhibit No. 24 from evidence, and it is unclear to us that the court did, in fact, exclude it from evidence. To exclude it from evidence, the court would have had to sustain an evidentiary objection to the exhibit. That never happened, as far as we can see from the record; at least, plaintiff cites no page of the record in which the court

ruled plaintiff's exhibit No. 24 to be inadmissible. Without objection by the defense, plaintiff's attorney questioned Dunnington and Fines about the exhibit. She elicited from them an admission that plaintiff did not meet three of the indications listed in the exhibit, and she quoted the indications in her cross-examination: (1) plaintiff had no "'[f]amily history of breast cancer in a first-degree relative (especially a mother or sister) who [was] premenopausal and has had bilateral breast cancer'"; (2) she did not have "'atypical hyperplasia'"; and (3) she did not have "'fibro[]nodular, dense breasts that [were] mammographically difficult to follow[] (evaluate) and [she did not] present[] with either of the above (or both) clinical presentations,'" that is, (1) or (2). Thus, the content of plaintiff's exhibit No. 24 went into substantive evidence. "[W]hen hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect." Jackson v. Board of Review of the Department of Labor, 105 Ill. 2d 501, 508, 475 N.E.2d 879, 883 (1985).

Plaintiff argues the trial court "belittled the importance of the standards by instructing the jury that they could not be considered as substantive evidence." But at the page of the record that plaintiff cites, the court never instructed the jury that position statements in general could not be considered as substantive evidence; the court merely instructed the jury that a single exhibit, plaintiff's exhibit No. 25 (not plaintiff's exhibit No. 24), could not be considered as substantive evidence. Plaintiff's exhibit No. 25 was a position statement that SSO issued in 2001. During the cross-examination of Fines by plaintiff's attorney, defendants' attorney objected to plaintiff's exhibit No. 25 on the ground that it "was published after the treatment *** in this case." Plaintiff's attorney responded:

- 46 -

"MS. de SAINT PHALLE: Your Honor, I think it's relevant because [Fines is] saying that the standard of care changed after 1993. I'm going to show him the 2001 standard that [says] the exact same thing as the 1993 statement, so--

THE COURT: For impeachment only[,] I'll allow it. It is not substantive evidence, ladies and gentlemen."

This was not to say that every position statement that SSO ever issued was substantively inadmissible in the trial. The particular position statement at issue here, plaintiff's exhibit No. 25, was relevant only for impeachment not because it was a position statement but because SSO published it after Dunnington treated plaintiff.

In the jury's presence, the trial court never sustained an objection to plaintiff's exhibit No. 24 or otherwise signified to the jury that it was inadmissible. Outside the jury's presence, the court merely declined to send the exhibit to the jury room. The court told plaintiff's attorney she could nevertheless make arguments to the jury regarding the exhibit. "The decision whether to send exhibits to the jury room is within the trial court's sound discretion, and a reviewing court will not disturb that decision absent an abuse of discretion that prejudices a party." VanWinkle v. Owens-Corning Fiberglas Corp., 291 Ill. App. 3d 165, 176, 683 N.E.2d 985, 993 (1997). Even under Federal Rule of Evidence 803(18), which the supreme court has not yet adopted (Roach v. Springfield Clinic, 157 Ill. 2d 29, 46, 623 N.E.2d 246, 254 (1993)) and which is more generous than Illinois law in allowing the use of learned publications as substantive evidence, such materials are never sent to the jury room (Fed. R. Evid.

803(18) (28 U.S.C. app. Fed R. Evid. 803(18) (2000)).  Illinois law permits the substantive admission of professional standards (Darling v. Charleston Community Memorial Hospital, 33 Ill. 2d 326, 332, 211 N.E.2d 253, 257 (1965); IPI Civil (2006) No. 105.01), but unlike Federal Rule of Evidence 803(18), it does not permit the substantive admission of medical treatises (Walski v. Tiesenga, 72 Ill. 2d 249, 258-59, 381 N.E.2d 279, 283 (1978); Fornoff v. Parke Davis & Co., 105 Ill. App. 3d 681, 690-91, 434 N.E.2d 793, 801 (1982)).  Even under the more liberal federal rule, however, the learned publications do not go to the jury during deliberations:  "If admitted, the statements [from learned publications] may be read into evidence but may not be received as exhibits."  Fed. R. Evid. 803(18).

The advisory committee's note to Federal Rule of Evidence 803(18) observes that while scholarly writers generally favor the admissibility of learned treatises, most courts oppose their admissibility as substantive evidence, although they allow treatises to be used for impeachment in the cross-examination of experts.  Fed. R. Evid. 803(18), Notes of Advisory Committee on Proposed Rules.  The argument in favor of substantive admissibility is that "the hearsay objection must be regarded as unimpressive when directed against treatises since a high standard of accuracy is engendered by various factors:  the treatise is written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake."  Fed. R. Evid. 803(18), Notes of Advisory Committee on Proposed Rules.  Although, generally, treatises might be trustworthy, they often are written for specialists and presuppose that the reader has a specialized education that laypersons lack; consequently, it is "likel[y] that the treatise will be misunderstood and misapplied

without expert assistance and supervision."  Fed. R. Evid. 803(18), Notes of Advisory Committee on Proposed Rules.  In two ways, the federal rule lessens the danger of misunderstanding and misapplication:  (1) "limiting the use of treatises as substantive evidence to situations in which an expert is on the stand and available to explain and assist in the application of the treatise[,] if desired"; and (2) prohibiting the court from "receiving the publication itself physically in evidence."  Fed. R. Evid. 803(18), Notes of Advisory Committee on Proposed Rules.

While allowing plaintiff's attorney to make arguments to the jury regarding plaintiff's exhibit No. 24, the trial court could reasonably decline to receive the exhibit itself physically into evidence and send it to the jury room.  With its exotic terminology, such as "atypical hyperplasia of lobular or ductal origin," the exhibit obviously is not written for laypersons, and a jury is likely to speculate about what it does not understand.  The jury heard plaintiff's attorney cross-examine Dunnington and Fines regarding the exhibit.  The jury heard these two witnesses admit that plaintiff did not meet the three indications therein.  Thus, the content of the exhibit was already in evidence.  Plaintiff's attorney was free to quote the exhibit in her closing argument, if she so desired.  Withholding the exhibit from the jury room lessened the danger of misunderstanding and misapplication.  We find no abuse of discretion in that regard.

B. The Impeachment of Plaintiff

At trial, plaintiff testified she was "confused" when she wrote, on the "History" form in Dunnington's office, that her mother had cancer in both breasts at age 26.  Then, over objection, the trial court allowed defendants' attorney to question plaintiff about the inconsistent testimony she had given in her discovery deposition:

"Q. During your discovery deposition, you didn't tell me that you were confused[] and that's the reason why you wrote, 'Both breasts at 26,' did you?

A. No.

Q. You didn't tell me that, did you?

A. No, I didn't.

Q. Instead, you said, 'I didn't write that,' didn't you?

A. Yes."

Plaintiff argues that a witness's credibility may not be impeached with a specific act of untruthfulness. See People v. Santos, 211 Ill. 2d 395, 404, 813 N.E.2d 159, 163 (2004). She further argues that the "impeachment" of her was only a pretense of impeachment: impeachment is supposed to be a means of canceling out damaging testimony, whereas, here, there was no damaging testimony to cancel out: plaintiff testified at trial that she was the one who had written, "Mother [b]oth [b]reast[s] at 26." See People v. Cruz, 162 Ill. 2d 314, 363, 643 N.E.2d 636, 659 (1994).

These arguments overlook plaintiff's status as a party. Impeaching or not, a party's prior inconsistent statement is an admission. People v. Adams, 265 Ill. App. 3d 181, 188-89, 638 N.E.2d 254, 259 (1994). "Discovery depositions *** may be used *** as an admission made by a party *** in the same manner and to the same extent as any other admission made by that person ***." 210 Ill. 2d R. 212 (a)(2). "Any oral or written out-of-court statement by a party to the action *** which tends to establish or disprove any material fact in a case is an admission and is competent evidence against that party in the action." Ficken v. Alton & Southern RY. Co., 291 Ill. App. 3d 635, 647, 685 N.E.2d

1, 10 (1996).

An admission must be relevant.  Gillson v. Gulf, Mobile & Ohio R.R. Co., 42 Ill. 2d 193, 197, 246 N.E.2d 269, 272 (1969).  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of an action *** more or less probable than it would be without the evidence."  People v. Morgan, 197 Ill. 2d 404, 455-56, 758 N.E.2d 813, 843 (2001).  Under long-standing case law, a party's deliberate falsehood regarding a material fact of the litigation is considered relevant to the "righteousness" of the party's cause.  Lubbers v. Norfolk & Western Ry. Co. , 118 Ill. App. 3d 705, 712, 454 N.E.2d 1186, 1191 (1983), citing People v. Spaulding, 309 Ill. 292, 305-06, 141 N.E. 196, 202 (1923).  " 'By resorting to wrongful devices[,] [a party] is said to give ground for believing that he thinks his case is weak and not to be won by fair means.  Accordingly, a party's false statement about the matter in litigation, whether before suit or on the stand, *** [is a] type of admission by conduct.' " (Emphasis omitted.)  Lubbers, 118 Ill. App. 3d at 711, 454 N.E.2d at 1191, quoting D. McCormick, Evidence §273, at 660 (2d ed. 1972).  If the jury believed Dunnington and Fines that, under the circumstances, it was within the standard of care to rely on information that plaintiff had written on the medical-history form, the fact that plaintiff wrote the information is material.  In her deposition, she falsely denied that material fact.  We find no abuse of discretion in the overruling of plaintiff's objection.

C. Refusal To Allow the Use of Plaintiff's Exhibit No. 45 for Impeachment

Plaintiff's exhibit No. 45 was an article entitled "Breast Cancer Management," published in 1999 in a peer-reviewed medical journal, Surgical Clinics of North America.  The author was Lynn Hartman.  Plaintiff's attorney asked Dunnington:

"[Hartman] is authoritative in the field of breast cancer, is she not?" He answered:

"Yes, for a single landmark article." The trial court refused to allow plaintiff's attorney

to cross-examine Dunnington on plaintiff's exhibit No. 45 because plaintiff failed to

prove that the specific article, as opposed to its author, was authoritative. Plaintiff

argues the court thereby abused its discretion.

The supreme court has held: "In our opinion[,] expert testimony will be

*** more effective *** in the attainment of justice if cross-examination is permitted as to

the views of recognized authorities, expressed in treatises or periodicals written for

professional colleagues. (Cf. Model Code of Evidence, Rule 529[, at 294 (1942)].) The

author's competence is established if the judge takes judicial notice of it, or if it is

established by a witness expert in the subject." Darling, 33 Ill. 2d at 336, 211 N.E.2d at

259. The cited rule of the Model Code of Evidence provides as follows:

"Rule 529. Learned Treatise.

A published treatise, periodical[,] or pamphlet on a

subject of history, science[,] or art is admissible as tending to

prove the truth of a matter stated therein if the judge takes

judicial notice, or a witness expert in the subject testifies,

that the writer of the statement in the treatise, periodical[,]

or pamphlet is recognized in his profession or calling as an

expert in the subject." Model Code of Evidence, Rule 529, at

294 (1942).

As we said, the supreme court has not gone so far as to hold that treatises

are substantively admissible. But, under Darling and Rule 529, treatises and other

- 52 -

learned publications are admissible if an expert testified to the author's competence in the profession.

The First District takes the same view. It holds that a learned text is admissible for impeachment on cross-examination in any of the following three circumstances: (1) the trial court takes judicial notice of the author's competence, (2) the witness concedes the author's competence, or (3) the cross-examiner proves the author's competence by a witness with expertise in the subject matter. Bowman v. University of Chicago Hospitals, 366 Ill. App. 3d 577, 587, 852 N.E.2d 383, 392 (2006).

In the present case, Dunnington--himself an expert--gave an affirmative answer to the question of whether Hartman, the author of plaintiff's exhibit No. 45, was "authoritative in the field of breast cancer." Ergo, the trial court erred in refusing to allow plaintiff's attorney to use the exhibit in her cross-examination of him. When we consider, however, all the other learned publications that plaintiff used to impeach Dunnington, we find it unlikely that allowing her to use this additional source would have made a difference in the verdict. Therefore, we find the error to be harmless.

D. Lack of an Offer of Proof Regarding Plaintiff's Exhibit No. 35

Plaintiff's attorney handed Fines plaintiff's exhibit No. 35, which he identified as a review article entitled "Prophylactic Surgery in Women with Hereditary Predisposition to Breast and Ovarian Cancer." This exhibit is in the record. It was published in the May 2000 edition of the Journal of Clinical Oncology. The authors are Andrea Eisen, Timothy R. Rebbeck, William C. Wood, and Weber. According to a note on the first page of the article, the authors submitted the article for publication on August 10, 1999. Plaintiff's attorney asked Fines:

"Q. And, Doctor, let me ask you if you agree with this Statement at the bottom of [p]age 19--

MR. HARLESS: Let me object to the timing of this publication[, which] is after the date of the assessment in this case.

MS. de SAINT PHALLE: Your Honor--

THE COURT: What are the dates?

MS. de SAINT PHALLE: It was written--it was submitted August 10th of 1999 and accepted January 21st[] of 2000.

THE COURT: And when was it published?

MS. de SAINT PHALLE: It was published in May of 2000.

THE COURT: I'll sustain. I'll sustain the objection."

Plaintiff's attorney then moved on to a different subject in her cross-examination of Fines.

On appeal, plaintiff argues the trial court abused its discretion in sustaining the objection. She argues that the article "discusse[s] the management options then in use at the University of Pennsylvania and Emory [University School of Medicine]" and the article "would have been significant in impeaching Dr. Fines because Emory is the academic referral center for the area where he practices." She further argues the article "[is] significant because the article's co-authorship between plaintiff's expert and the surgeon chairman of the breast center rebutted Dr. Dunnington's

- 54 -

contention that Dr. Weber's expertise was limited to genetics."  Citing Granberry v.

Carbondale Clinic, S.C., 285 Ill. App. 3d 54, 65, 672 N.E.2d 1296, 1304 (1996), and

Bergman v. Kelsey, 375 Ill. App. 3d 612, 630, 873 N.E.2d 486, 509 (2007), she argues

that postevent texts can be used in cross-examination for purposes other than to

establish the standard of care.

The problem is, plaintiff did not inform the trial court of those purposes in

an offer of proof.  "To be adequate, an offer of proof must apprise the trial court of what

the offered evidence is or what the expected testimony will be, by whom it will be

presented[,] and its purpose."  Chicago Park District v. Richardson, 220 Ill. App. 3d 696,

701, 581 N.E.2d 97, 100 (1991).  Unless the purpose of the proffered evidence is clear

from the question itself (Moss v. Miller, 254 Ill. App. 3d 174, 183, 625 N.E.2d 1044, 1050

(1993)), counsel must explain the purpose to the trial court as part of the offer of proof

(People v. Hoffee, 354 Ill. 123, 140, 188 N.E. 186, 192 (1933)).  Plaintiff's attorney did

not inform the trial court how plaintiff's exhibit No. 35 would impeach Fines and

Dunnington or what her purposes were in offering the exhibit.  Those purposes were not

apparent from the question itself.  Absent such an offer of proof, the issue of whether the

court erred in excluding the exhibit is forfeited.  See Chicago Park District, 220 Ill. App.

3d at 702, 581 N.E.2d at 100.

E. Refusal To Allow Plaintiff To Show the Jury the Various
Learned Publications She Had Used To Impeach Defense Witnesses

Plaintiff argues the trial court erred in refusing to allow her to show to the

jury the scholarly materials she used to impeach the defense witnesses, i.e., plaintiff's

exhibit No. 23, a book chapter written by Dunnington; plaintiff's exhibit No. 24, the SSO

- 55 -

standards for bilateral prophylactic mastectomies; plaintiff's exhibit No. 26, a book chapter stating that obtaining family pathology records are an integral part of compiling the family history; plaintiff's exhibit No. 30, an algorithm for evaluation of women at increased risk for breast cancer; plaintiff's exhibit No. 37, indications for prophylactic mastectomies; and plaintiff's exhibit Nos. 38, 42, and 53, articles by Weber.

Plaintiff cites People v. Anderson, 113 Ill. 2d 1, 495 N.E.2d 485 (1986), for the proposition that "[t]he [s]upreme [c]ourt permits the publishing to the jury of materials used on cross-examination." We do not see where, in Anderson, the supreme court said so, and plaintiff does not provide us a pinpoint citation. (Throughout her brief, plaintiff frequently cites cases without citing the pertinent page number within those cases--a violation of Illinois Supreme Court Rule 6 (145 Ill. 2d R. 6). See Putman v. Village of Bensenville, 337 Ill. App. 3d 197, 201, 786 N.E.2d 203, 205 (2003) (failure to obey Rule 6's requirement of citing the page of the case on which the pertinent matter appears can result in forfeiture of the argument).) In Anderson, 113 Ill. 2d at 9, 495 N.E.2d at 488, the supreme court held that "an expert should be allowed to reveal the contents of materials upon which he reasonably relies in order to explain the basis of his opinion"; but we do not see where that case says anything about publishing those materials to the jury in the sense of physically distributing a copy of them to the jury. Plaintiff cites no authority holding that a trial court must allow copies of impeachment materials to be distributed to the jury, either in the courtroom or the deliberation room. Her failure to cite relevant authority results in a forfeiture of this argument. See Vine Street Clinic v. HealthLink, Inc., 222 Ill. 2d 276, 301, 856 N.E.2d 422, 438 (2006).

F. Partial Summary Judgment

Defendants sought a summary determination in their favor on paragraphs 23(c) and (d) of counts I and II of the second amended complaint. The trial court granted their motion on March 8, 2007.

On March 13, 2007, plaintiff filed an "Amendment to the [Second] Amended Complaint," in which she deleted paragraphs 23(c) and (d). Section 2-1005(d) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005(d) (West 2006)) did not require her to do this. Rather, the determined issues were to be set down in an order, and the trial was to be conducted accordingly. See 735 ILCS 5/2-1005(d) (West 2006). "[T]he issue of the propriety of the trial court's grant of summary judgment is not properly before this court, for when an amendment is filed that is complete in itself and that does not refer to or adopt by reference the prior pleadings, the earlier pleadings are effectively withdrawn and cease to be part of the record for most purposes." Gilley v. Kiddel, 372 Ill. App. 3d 271, 274, 865 N.E.2d 262, 265 (2007). By filing the amendment to the second amended complaint--an amendment that deleted the subparagraphs on which the trial court had granted summary judgment--plaintiff forfeited any objection to the summary judgment. See Gilley, 372 Ill. App. 3d at 274, 865 N.E.2d at 266.

G. Defendants' Motion in Limine

On February 22, 2007, defendants filed a motion in limine, in which they sought to bar plaintiff from alleging to the jury that Dunnington did the following:

"4. Dr. Dunnington did not refer Sandra Downey for genetic counseling because Medicaid/[p]ublic [a]id would not cover the cost of genetic testing.

5. Dr. Dunnington did not refer Sandra Downey for

- 57 -

genetic counseling and testing because she was unable to pay

for those services."

In a hearing on February 23, 2007, the trial court granted those paragraphs of the motion in limine.  Plaintiff contends, on appeal, that the court thereby erred.

On March 8, 2007, after granting the motion in limine, the trial court granted defendants' motion for partial summary judgment, in which they pleaded as follows:

"1. Judgment should be entered in favor of

[d]efendants because there is no genuine issue of material

fact that Dr. Dunnington did not allow considerations of

[p]laintiff's ability to pay for genetic testing to affect the

manner in which he presented treatment options to the

plaintiff."

As we have explained, given plaintiff's amendment of her second amended complaint, this summary judgment is not properly before us.  Under section 2-1005(d) of the Code (735 ILCS 5/2-1005(d) (West 2006)), the trial was to proceed in accordance with the summary judgment.  If, as the summary judgment determined, Dunnington "did not allow considerations of [p]laintiff's ability to pay for genetic testing to affect the manner in which he presented treatment options to the [p]laintiff," it would be impossible, consistently with that determination, to make the claims that paragraphs 4 and 5 of the motion in limine sought to bar.  Therefore, we uphold the ruling on the motion in limine.  The testimony the trial court struck from Weber's evidence deposition was inadmissible because of the summary judgment and the ruling on the motion in

limine.

H. Asking Weber Whether Plaintiff Would Have Undergone Genetic Testing

In Weber's evidence deposition, defendants' attorney asked Weber:

"Q. Doctor, isn't it true that even if Sandra Downey

had undergone genetic counseling, you can't say that she

would have had genetic testing, can you?

A. No, but I can say that if I think she had a bilateral

prophylactic mastectomy[] in the absence of genetic testing,

that that would have been a mistake.

MR. HARLESS:  I move to strike her answer as

nonresponsive.

Q. Isn't it true, Dr. Weber, that even if Sandra Downey

had undergone genetic counseling, you can't say that she

would have had genetic testing, can you?

A. No."

The trial court granted defendants' motion to strike the first question and answer, quoted above, on the ground that the answer was unresponsive to the question. The court denied plaintiff's motion to strike the second question and answer on the ground that it was impermissible to ask an expert to speculate as to what decision plaintiff would have made about undergoing genetic testing.  On appeal, plaintiff argues that the court thereby erred, for Weber's opinion in that respect was speculative and the jury, rather than an expert, should assess the credibility of the plaintiff's testimony in informed-consent cases.  See Mansmith v. Hameeduddin, 369 Ill. App. 3d 417, 435, 860

- 59 -

N.E.2d 395, 411 (2006); Coryell v. Smith, 274 Ill. App. 3d 543, 550, 653 N.E.2d 1317, 1321 (1995). We agree, but according to plaintiff's petition for rehearing, the real issue in this case was whether Dunnington should have even offered prophylactic mastectomies to plaintiff, given her true medical history. The petition argues: "Since mastectomies were not medically indicated, [plaintiff's] predilections and choices were irrelevant. Thus, the outcome of this case turned on whether Dunnington had an obligation to verify the medical history before undertaking an invasive and totally elective procedure." From this argument, it seems to follow that Weber's opinion about plaintiff's "predilections and choices" is harmless.

I. Allowing the Defense To Elicit Testimony That Dunnington's Father was a Clergyman

Defendants' attorney asked Dunnington:

"Q. Dr. Dunnington, I want you to go back a ways. I want to talk to you about where you grew up, where you were born[.] What does your family consist of when you were growing up?

MS. de SAINT PHALLE: I'm going to object to the relevance of this.

THE COURT: Overruled.

THE WITNESS: I grew up in a small town in Indiana, New Castle, Indiana, and my father was a minister. My mother was a housewife, stay-at-home mom, and there were four children in the family."

Plaintiff argues: "Introducing evidence that Dr. Dunnington's father was a

- 60 -

minister had no relationship to any issue in this case. [Citation to record.] It was plainly an improper attempt to bolster his credibility[] and to curry favor with the jury." She cites <u>Pearson v. Ford Motor Co.</u>, 32 Ill. App. 3d 188, 192-93, 336 N.E.2d 528, 532 (1975), for the proposition that "[i]ntroducing evidence of a party's domestic circumstances is highly prejudicial" and <u>McCarthy v. Spring Valley Coal Co.</u>, 232 Ill. 473, 479-80, 83 N.E. 957, 960 (1908), for the proposition that doing so is reversible error.

The rule is stark and absolute: "Irrelevant evidence is not admissible." <u>Maffett v. Bliss</u>, 329 Ill. App. 3d 562, 574, 771 N.E.2d 445, 455 (2002). As we have explained, evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action either more or less probable that it would be without the evidence. <u>Morgan</u>, 197 Ill. 2d at 455-56, 758 N.E.2d at 843. "[W]hat Dunnington's family consist[ed] of when [he was] growing up" had no such tendency. <u>Ergo</u>, it was irrelevant and inadmissible that Dunnington's father was a clergyman, and the trial court abused its discretion by overruling plaintiff's objection. Such evidence is wholly irrelevant to the issues in this trial, and the use of such evidence constitutes an aberrant practice that should not be tolerated. Not only does the evidence lack any logical relationship to the action on trial, but it has the further nefarious purpose of requiring opposing counsel to object, calling undue attention to both the significance of the evidence and the efforts of the objecting party.

This error, however, was not as prejudicial as in <u>Pearson</u> and <u>McCarthy</u>. In those cases, a laborer was seeking compensation for personal injuries, and the laborer's attorney informed the jury that the laborer had a wife and five children. <u>Pearson</u>, 32 Ill. app. 3d at 192, 336 N.E.2d at 531; <u>McCarthy</u>, 232 Ill. at 479, 83 N.E. at 960. Those are

- 61 -

different domestic circumstances than in the present case. That Dunnington's father was a clergyman does not provide as strong an emotional incentive as the laborer's impoverished wife and five children. We find error, but not reversible error.

In her petition for rehearing, plaintiff argues that the erroneously admitted evidence had the effect of contrasting her "former status as a 15[-]year[-]old pregnant high[-]school dropout [with] Dunnington's status as the son of a minister with a stay[-]at[-]home mom." She argues that "Dunnington's religious upbringing could have had an impact on the jury in evaluating whether Dunnington was telling the truth in his claim that the standard of care did not require verification of medical history." She cites Freeding-Skokie Roll-Off Service, Inc. v. Hamilton, 108 Ill. 2d 217, 223, 483 N.E.2d 524, 527 (1985), for the following proposition: "'Where error is shown to exist, it will compel reversal, unless the record affirmatively shows that the error was not prejudicial.' (Duffy v. Cortesi (1954), 2 Ill. 2d 511, 517[, 119 N.E.2d 241, 245].)" In Hamilton, 108 Ill. 2d at 223, 483 N.E.2d at 527, however, the plaintiff's counsel "emphasized" the erroneously admitted testimony in closing arguments, and for that reason, the supreme court held the record did not affirmatively show the error was not prejudicial. It does not appear that defendants' counsel emphasized the religious vocation of Dunnington's father. In another case that plaintiff cites, Koonce v. Pacilio, 307 Ill. App. 3d 449, 456, 718 N.E.2d 628, 634 (1999), defense counsel implied his clients had no insurance and, therefore, would be personally responsible for the satisfaction of any judgment against them, and he also vouched for the honesty and character of his clients and inaccurately summarized the evidence. A passing reference to Dunnington's childhood is not even remotely comparable in its prejudicial impact. In the other case that plaintiff cites,

<u>Lorenz v. Siano</u>, 248 Ill. App. 3d 946, 953-54, 618 N.E.2d 666, 671 (1993), defense counsel asked his client, in a personal-injury case, about the ownership of his home and the amount of his annual income. The appellate court said: "It has long been the rule in Illinois that appeals to the passion or sympathy of the jury are improper and are sufficient cause for reversing a judgment unless it can be said that the prejudice suffered was so minimal that it did not impact upon the outcome of trial." <u>Lorenz</u>, 248 Ill. App. 3d at 953, 618 N.E.2d at 671. Again, we do not find the religious vocation of Dunnington's father to be comparable, in its emotional impact, to a defendant's financial hardship in a personal-injury case.

To reverse the verdict, we would have to attribute to the jury a simplemindedness and even a viciousness that are implausible. We would have to infer that the jury considered Dunnington to be a paragon of virtue because, decades ago, he was raised by a father who was a minister and a mother who was a housewife. We also would have to infer that, in its verdict, the jury punished plaintiff because, compared to Dunnington, she had an unfortunate childhood. We choose to believe better of the jury. We conclude that the prejudice was not great enough to have affected the verdict. See <u>Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.</u>, 199 Ill. 2d 325, 364, 770 N.E.2d 177, 201 (2002).

Plaintiff argues that "rigid application of the harmless[-]error doctrine" provides little incentive for counsel to refrain from errors in the future. It is unclear what plaintiff means by applying the doctrine "rigidly." There is no question of rigidity or flexibility. Either the error is harmless or not. Either the error changed the result, or it did not. <u>Belleville Toyota</u>, 199 Ill. 2d at 364, 770 N.E.2d at 201. Either the error

"substantially prejudiced a party and affected the outcome below," or it did not. Bradfield v. Illinois Central Gulf R.R. Co., 137 Ill. App. 3d 19, 23, 484 N.E.2d 365, 368 (1985). And the burden is on the party seeking reversal to establish such prejudice. Cairns v. Hansen, 170 Ill. App. 3d 505, 511, 524 N.E.2d 939, 944 (1988). The logic of incentives is undeniable, but the alternative to the plain-error doctrine would be requiring perfect trials. That alternative is impracticable.

### J. Denial of Plaintiff's Motion for a New Trial

Plaintiff argues the trial court abused its discretion in denying her motion for a new trial. We will overturn the ruling only if it was an abuse of discretion; and it was an abuse of discretion only if the jury's verdict was against the manifest weight of the evidence. See York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 178-79, 854 N.E.2d 635, 652-52 (2006). "A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary[,] and not based upon any other evidence." York, 222 Ill. 2d at 179, 854 N.E.2d at 652.

The jury's verdict is not against the manifest weight of the evidence. Conflicts in the evidence and disagreements among experts do not make a verdict against the manifest weight of the evidence. First National Bank of LaGrange v. Lowrey, 375 Ill. App. 3d 181, 213, 872 N.E.2d 447, 478 (2007), appeal denied, 226 Ill. 2d 583, 879 N.E.2d 930 (2007); Soberalski v. Chicago Rock Island & Pacific R.R. Co., 29 Ill. App. 3d 1019, 1024, 331 N.E.2d 645, 650 (1975). Weber disagreed with Dunnington and Fines on the standard of care. Plaintiff also impeached Dunnington and Fines with scholarly publications tending to show that verification of the patient's family history

was required and that plaintiff's risk of developing breast cancer, given her actual family history, was less than what Dunnington and Fines claimed. The jury had a choice: it could believe Weber, or it could believe Dunnington and Fines. When determining the standard of care applicable to a surgeon, the jury could have found the testimony of two experienced surgeons to be more persuasive than the testimony of an oncologist. It was for the jury to decide whether the articles from the medical journals made Dunnington and Fines unworthy of belief. The jury could have believed Fines when he testified that surgeons generally do not go on a quest for medical records to corroborate what patients tell them about their family history. The jury could have believed Dunnington when he testified that Betty Hart's premenopausal breast cancer was sufficient cause to offer bilateral prophylactic mastectomies to plaintiff, regardless of whether Betty's breast cancer was in both breasts and regardless of whether she had contracted ovarian cancer.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

KNECHT and STEIGMANN, JJ., concur.